UNITED STATES of America

v.

Frederick A. SPIEZIO, John Ferrara and
S & S Chemical, Inc.

Crim. No. 80–00333.

United States District Court,
E. D. Pennsylvania.

Sept. 22, 1981.

Peter F. Vaira, U. S. Atty., Robert L. Hickok, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Stanford Shmuckler, Philadelphia, Pa., for Spiezio.

I. Michael Luber, Philadelphia, Pa., for Ferrara.

Calvin Lieberman, Reading, Pa., for S & S.

## MEMORANDUM

CAHN, District Judge.

This criminal case was tried before me without a jury. Count One of the twenty-one count indictment charged a corporate defendant and two individual defendants with criminal conspiracy under 18 U.S.C. § 371. The indictment alleges that the three defendants conspired to violate, or conspired to aid and abet the violation of, 18 U.S.C. §§ 842(e) and 842(f).[1] The remaining twenty counts charge Spiezio with distributing, or aiding and abetting the distribution of, fireworks in violation of 18 U.S.C. §§ 842(e) and 842(f). Before me are defendants' post-trial motions for judgment of acquittal and, in the alternative, motions for arrest of judgment or for new trial.

---

[1] In relevant part, these statutes provide:

(e) It shall be unlawful for any licensee knowingly to distribute any explosive materials to any person in any State where the purchase, possession, or use by such person of such explosive materials would be in violation of any State law or any published ordinance applicable at the place of distribution.

(f) It shall be unlawful for any licensee or permittee willfully to manufacture, import, purchase, distribute, or receive explosive materials without making such records as the Secretary may by regulation require, including, but not limited to, a statement of intended use, the name, date, place of birth, social security number or taxpayer identification number, and place of residence of any natural person to whom explosive materials are distributed.

Defendants challenge the judgments of conviction entered against defendants Frederick A. Spiezio, John Ferrara, and S & S Chemical, Inc. (S & S) on Count One of the indictment and against Frederick A. Spiezio for aiding and abetting S & S, the licensee, in Counts Two through Twenty-one. Defendants' allegations of error concern (i) the admissibility of evidence, (ii) the constitutionality of the federal fireworks statute, (iii) the interpretation of the state statute which forms the basis for defendants' federal convictions, and (iv) the sufficiency of the evidence supporting the conspiracy and aiding and abetting convictions. After careful consideration of defendants' arguments, I find them to be without merit.

## I. *FACTS*

I made Findings of Fact and reached Conclusions of Law in a bench opinion rendered at the conclusion of the nonjury trial. The bench opinion is appended hereto as Appendix A. The essential facts will be briefly recounted here.

### A. PERSONS INVOLVED

At all times material to the charges in the indictment defendant Spiezio was the principal operating officer of defendant S & S, a Douglassville, Pennsylvania, manufacturer of explosive materials including fireworks. Defendant Ferrara was an employee of S & S.

Mark Fisher was a potato chip salesman who purchased explosive materials from S & S and Spiezio for personal use and resale. Fisher became a "cooperating individual" shortly after his arrest by agents of the Bureau of Alcohol, Tobacco and Firearms (ATF) on February 25, 1980. Because of his cooperation, Fisher was not charged in this prosecution.

### B. THE SALES

On June 29, 1979, Spiezio and Fisher met at the S & S factory. Fisher was interested in buying fireworks for the Fourth of July holiday. Fisher purchased three bags of twenty M–100's ("Big Tans") at $15 per bag. Although not involved in any of the discussions, Ferrara was present.

On July 2, 1979, Fisher went back to the S & S factory to buy more fireworks. Spiezio said to Fisher that selling fireworks was "better than drugs" because the seller will be "out on the street after a fine." Ferrara took Fisher to a forty-foot trailer containing M–100's and smaller fireworks. Fisher bought six bags of M–100's for $90. Fisher told Spiezio that he was going to resell some of the fireworks along his route.

The next day, July 3, 1979, Fisher returned to S & S and purchased an additional $150 worth of M–100's. Ferrara filled Fisher's order. When Fisher paid Spiezio, Spiezio said, "[w]atch who you sell them to and if you get caught don't say where you got them." On this date, Fisher observed a number of persons standing in line with boxes of fireworks waiting to pay Spiezio.

Toward the end of July 1979, Fisher went to the S & S premises and bought some M–80 fireworks ("Reds"). On a date before August 28, 1979, Fisher purchased more "Reds." He bought a case of them from Spiezio at Spiezio's home for $300, which price included credit terms.

On August 28, 1979, an ATF undercover agent purchased one bag of "Reds" from Fisher at the Anvil Inn in Kennett Square, Pennsylvania. Fisher had previously bought these firecrackers from Spiezio.

On September 4, 1979, the undercover agent met Fisher again in Kennett Square. Fisher took the agent to the S & S premises where the agent purchased four bags of M–100's. Fisher acted as an intermediary during this transaction, but he did not introduce the agent to Spiezio and Ferrara. Fisher made a profit on this sale by paying Spiezio $100 for six bags and then reselling four bags to the agent for $100, retaining two bags for himself. The agent gave Fisher an additional $10 for his pocket.

On February 25, 1980, the same undercover agent and another undercover agent arranged to purchase $1,000 worth of M–100's from Fisher. Fisher bought two cases of M–100's for $600 at the S & S factory. Fisher paid $300 to Spiezio as partial pay-

ment for the M–100's and agreed to owe Spiezio another $300. Fisher then went to meet the agents at a restaurant. He took them to his home. When it came time to pay Fisher $1,000 for the firecrackers, the agents revealed themselves to be ATF agents. Shortly afterward Fisher became a cooperating individual. He took the two undercover agents to S & S to buy M–100's directly from Spiezio. Fisher introduced one of the agents to Spiezio. Spiezio then sold ten bags of M–100's to the undercover agent. Ferrara filled the order and discussed the sale of fireworks, stating "[w]e deliver a lotta dogs down there [Philadelphia]." "Dogs" is a word which refers to firecrackers.

On April 23, 1980, both undercover agents went to the S & S premises. Fisher introduced the other ATF agent to Spiezio. Spiezio sold him a case of M–100's for $300. Ferrara filled the order and discussed problems caused by poorly made firecrackers. Ferrara said that in the previous year he had sold $17,000 worth of firecrackers in the Philadelphia area.

On June 10, 1980, both agents went to the S & S premises again and arranged to purchase $5,000 worth of firecrackers. Once the order was filled and the goods placed in the agents' truck, but before the money was delivered to Spiezio, the ATF agents identified themselves to Spiezio.

### C. FAILURE TO COMPLETE REQUIRED FORMS

Spiezio did not obtain any information or complete any records relating to ATF Form 4710 in regard to any of the sales to Fisher and the undercover agents.

### D. CHEMICAL ANALYSIS OF FIRECRACKERS

Qualitative analysis of the firecrackers sold by Spiezio revealed that they contained a perchlorate explosive mixture which is an explosive material regulated under 18 U.S.C. § 841(d). Each M–80 contained 4.1

grams of perchlorate explosive mixture. Each M–100 contained 21.3 grams of the mixture. Spiezio also sold an additional seven types of explosive devices. Each type contained more than 2 grams of perchlorate explosive mixture.

## II. ADMISSIBILITY OF EVIDENCE

The defendants contend that the court erred in admitting into evidence at trial (a) tape recordings of conversations involving Mark Fisher and federal agents, (b) Fisher's testimony, and (c) motion pictures and still photographs taken to demonstrate the explosive capabilities of the firecrackers. I will address these contentions separately.

### A. TAPE RECORDINGS

■ Defendants assert that the admission of tape recordings of conversations between Fisher and the federal agents violated the hearsay rule and substantially prejudiced defendants' right to a fair trial. At trial, defendants objected to the introduction of any recordings of conversations which did not take place in the presence of either defendant. I conditionally admitted the evidence pending the government's proof that these out-of-court statements were admissible as declarations of co-conspirator Fisher. Fed.R.Evid. 801(d)(2)(e).

At the close of evidence I determined that Fisher was not a co-conspirator. While the failure of the government to meet its burden of showing evidence to be admissible may provide the basis upon which to declare a mistrial, such a decision is not always appropriate.[2] *United States v. Nelson,* 603 F.2d 42 (8th Cir. 1979); *United States v. James,* 590 F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

In the instant case, hearing the recordings in no way prejudiced my verdicts as the finder of fact. I did not rely upon the recorded conversations as substantive evidence in reaching my decision. I was cor-

---

**2.** In a jury trial, a cautionary instruction may serve to cure any prejudice caused by the admission of evidence later deemed inadmissible.

rect to consider the tape of a conversation between Fisher and the agents on February 25, 1980, as it pertained to Fisher's competence and credibility as a witness. I did not consider these conversations for any other purpose.

Assuming *arguendo* that the tape recordings were improperly admitted for any purpose, such error would be harmless because the outcome of the case would remain the same. First, Fisher testified after all the tapes were played, and he was cross-examined by defendants' attorneys. Thus, any prejudice from admitting an out-of-court statement was cured. Also, Fisher's prior taped statements were consistent with his direct testimony (introduced after the tapes were played) and were used to rebut the obvious contention of the defendants of improper influence or motive. *See* Fed.R. Evid. 801(d)(1)(B). I agree that it would have been better practice to receive the direct testimony first and then play the tapes, but I perceive no harm to the defendants in altering the preferred order of proof. Second, the government proved the elements of the crimes charged independently of the conversations between Fisher and the federal agents. Actually, the conversations between the ATF undercover agents and Spiezio and Ferrara were recorded.

## B. FISHER'S TESTIMONY

■ Defendants claim three grounds of error regarding Fisher's testimony at the trial. They argue Fisher's testimony was incredible because (i) he read the tape transcripts before testifying, (ii) he admittedly used marijuana, and (iii) he was a corrupt source since he too violated the fireworks law.

### 1. REVIEWING OF TAPES BEFORE TESTIFYING

The fact that Fisher reviewed the tape recordings of his conversations does not render his testimony inherently incredible. It is a factor I took into account in determining what weight to give his testimony.

### 2. DRUG USE

Attacking Fisher's memory of the events in question with evidence of his marijuana use does not seriously undermine the value of his testimony. In this jurisdiction, evidence of drug use may be admitted. *United States v. Hicks*, 389 F.2d 49 (3d Cir.), *cert. denied*, 391 U.S. 970, 88 S.Ct. 2046, 20 L.Ed.2d 885 (1968). The introduction of such evidence requires expert testimony that use of a particular drug in a certain dosage would impair a witness's mental capacity. There was no such testimony here. In determining Fisher's credibility, I considered his demeanor on the stand and I used my common sense in evaluating his testimony. *Dyer v. MacDougall*, 201 F.2d 265 (2d Cir. 1952). I took into consideration the evidence relating to Fisher's marijuana use and found it had no significant effect on Fisher's credibility or his memory.

### 3. WEIGHT ACCORDED INFORMANT'S TESTIMONY

Defendants argue that I should have given Fisher's testimony little weight because he admittedly violated the law by purchasing "explosive devices" without a license and because he was granted immunity from prosecution for his prior misconduct in exchange for his cooperation with the government. Recognizing this evidence as relevant to bias and the proper assessment of Fisher's credibility, I took due notice of the fact that his testimony might have been tainted. *United States v. Kubacki*, 237 F.Supp. 638 (E.D.Pa.1965). As fact finder, I balanced these considerations and accepted Fisher's testimony as credible.

### C. MOTION PICTURES

Defendants challenged the admission into evidence of motion pictures involving three large explosions. The government filmed two separate explosions of firecrackers seized from S & S and Spiezio. In each explosion more than two thousand firecrackers were detonated. In a third explosion film three individual firecrackers were attached to a mannequin. They were detonated separately with the result that the

mannequin was totally destroyed. In the first two explosions, the ATF expert added CD–4, a military explosive, to the firecrackers in order to ensure that all would detonate. The bases for defendants' claim center on the enhancement and staging of the demonstration and on its prejudicial impact. As stated in my bench opinion, I admitted the films as evidence to counter defendants' claims that the firecrackers were not explosive materials within the meaning of 18 U.S.C. § 842(e) and § 842(f) and that the regulations of the Secretary of the Treasury relating to firecrackers are unreasonable. The films illustrated the explosive capabilities of firecrackers and the dangers connected with their use.

█ In general, when determining the admissibility of motion pictures into evidence, the trial court must balance prejudice against probative value. Motion pictures have been properly admitted to demonstrate the physical possibility of events occurring as charged. The occurrences filmed must bear a close relationship to the occurrences relevant in the case. This relationship must be corroborated by an expert. Even where the events filmed do not bear much similarity to the events in question, the film is admissible for the limited purpose of demonstrating a theoretical principle. *Harkins v. Ford Motor Co.*, 437 F.2d 276 (3d Cir. 1970).

█ I properly admitted the motion pictures to demonstrate the explosive character of the fireworks. The ATF expert explained the effect of the CD–4 on the demonstration. I took into account his testimony that the CD–4 made the first two explosions more violent and that a mannequin may be more susceptible to damage than a human body. *Millers' Nat. Ins. Co., Chicago, Ill. v. Wichita Flour M. Co.*, 257 F.2d 93 (10th Cir. 1958) (film demonstration of explosive effects of pressure in tank filled with wheat admitted). I weighed the evidentiary value of the films in accordance with those obvious limitations. Moreover, I accorded the films little weight in reaching my determination.

### III. CONSTITUTIONALITY OF 18 U.S.C. § 842(e) and § 842(f)

#### A. SECTION 842(e)

Defendants assert that 18 U.S.C. § 842(e) is unconstitutional under the ninth and tenth amendments and lacks a rational basis to effectuate a valid purpose. I have considered and properly rejected defendants' arguments in my bench opinion. Defendants have raised no new arguments of merit here.

#### B. SECTION 842(f) AND FIFTH AMENDMENT PROHIBITION AGAINST SELF–INCRIMINATION

█ Defendants challenge the constitutionality of 18 U.S.C. § 842(f) on the ground that the reporting requirement compels the defendants to incriminate themselves in violation of their fifth amendment rights. Defendants' contention is incorrect. The fifth amendment privilege is not violated by reporting requirements of a regulatory nature that apply to lawful activities. *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971); *United States v. Stirling*, 571 F.2d 708, 727–8 (2d Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). Explosives, unlike gambling activities, are not inherently criminal, but they are inherently dangerous. Thus Congress has a legitimate aim in controlling explosives which is furthered in a reasonable manner by the reporting requirements of 18 U.S.C. § 842(f). The statute is constitutional and the defendants' fifth amendment rights have not been violated.

### IV. STATUTORY AND REGULATORY SCHEME

█ Defendants claim that the state statute relied upon to establish a violation of 18 U.S.C. § 842(e) does not apply to the sales of explosives made to Fisher and the federal agents. The federal statutory scheme makes it illegal for a federally licensed manufacturer and dealer of explosives to distribute explosives in violation of

any state law. Defendants dispute my interpretation of the Pennsylvania statute.[3]

Defendants assert that the Pennsylvania statutory provisions should be read to prohibit retail sales but not wholesale transactions. They further claim that all the sales that took place were in wholesale lots and therefore were not in violation of the Pennsylvania statute. This argument is without merit. Defendants' interpretation would defeat the purpose of the statute. Rules of statutory construction demand that statutes be read as a whole. Reading § 1272 in light of § 1275 persuades me that the phrases "offer for sale" or "expose for sale" include a "wholesale" transaction unless it comes within the exception delineated in § 1275. "Wholesale" sales of fireworks are prohibited by § 1272 unless they fall within the precise limits of the § 1275 exception. Section 1275 contains the only exceptions, namely, wholesale shipments destined for foreign states or made to licensed in-state fireworks professionals.

Section 1272's prohibition against "sell[ing] at retail" merely sets forth one of several types of prohibited activities. Section 1272 also makes it unlawful to offer fireworks for sale or to expose fireworks for sale without the qualification that those transactions be at retail. There is no reason to permit wholesale transactions of fireworks within a state where retail sales are not allowed. The statutory language does not require that type of restrictive interpretation. There was, in the case at bar, no evidence that the fireworks were destined for states other than Pennsylvania. I was therefore correct in holding that 18 U.S.C. § 842(e) is applicable to the defendants because the sales of explosives violated Pennsylvania state law whether or not they were made at wholesale.

## V. CONSPIRACY

In their post-trial motions, defendants contend that my finding that a conspiracy existed between S & S, Spiezio and Ferrara was in error. They first claim that there was insufficient evidence to show that Ferrara conspired with the other defendants. They next argue that without Ferrara, there can be no conspiracy between the corporation and Spiezio, its principal operating officer, as a matter of law.[4] After

---

**3.** The statute, 35 Pa.Stat.Ann. § 1272 (Purdon), provides in relevant part:

Except as hereinafter provided, it shall be unlawful for any person, copartnership, association, or corporation to offer for sale, expose for sale, sell at retail, or use or explode any fireworks: . . . .

The statute contains an exemption at 35 Pa. Stat.Ann. § 1275 (Purdon):

Nothing in this act shall be construed to prohibit any resident wholesaler, dealer or jobber to sell at wholesale such fireworks as are not herein prohibited, or the sale of any kind of fireworks, provided that same are to be shipped directly out of state, or are to be used by a person holding a permit from any municipality at the display covered by such permit, or when used as authorized by a permit for agricultural purposes in connection with the raising of crops and the protection of crops from bird and animal damage, . . . .

**4.** Defendants argue that S & S and Spiezio cannot be conspirators as a matter of law. Spiezio was acting throughout as the principal operating officer of S & S. A corporation cannot conspire with itself. In an antitrust context, the acts of the agent are the acts of the corporation. *Nelson Radio & Supply Co. v.*

*Motorola Inc.*, 200 F.2d 911 (5th Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). However, the rule is different in other contexts and it has been held that a criminal conspiracy can be found between a corporation and its corporate personnel. *United States v. Consolidated Coal Co.*, 424 F.Supp. 577 (S.D.Ohio 1976); *United States v. Kemmel*, 160 F.Supp. 718 (M.D.Pa.1958). *See United States v. Wise*, 370 U.S. 405, 417, 82 S.Ct. 1354, 1362, 8 L.Ed.2d 590 (1962) (Harlan, J., concurring) ("the fiction of corporate entity, operative to protect officers from contract liability, had never been applied as a shield against criminal prosecutions. . . ."). The objectives of Sherman Act § 1 and 18 U.S.C. § 371 are different. The essence of the Sherman Act § 1 antitrust violation is the agreement *between enterprises.* The conduct which is the subject of the conspiracy, for example setting prices or marketing territories, would be legal and perhaps desirable if conducted within an enterprise unless it violated another antitrust prohibition. Thus it is contrary to the objectives of § 1 of the Sherman Act to punish agreements within an enterprise, such as agreements between a corporation and persons acting as its agents. On the other hand, the criminal conspiracy statute, 18 U.S.C. § 371, punishes agreements to violate

careful consideration of defendants' arguments, I hold the evidence supports my finding that Ferrara participated in a conspiracy with Spiezio and S & S.[5]

■ Since a conspiracy is necessarily covert, I am permitted to infer its existence based on the actions of alleged co-conspirators and on circumstantial evidence. *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). Mere knowledge of an illegal act is not sufficient to sustain a conspiracy conviction. *United States v. Grassi*, 616 F.2d 1295 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). However, the evidence showed that Ferrara knew of Spiezio's intention to distribute explosive materials illegally in Pennsylvania and later participated in such distribution. This constitutes the kind of evidence from which I correctly inferred an agreement between Ferrara, Spiezio and S & S.[6] *United States v. Shoup*, 608 F.2d 950 (3d Cir. 1979). I therefore need not reach the issue of whether there can be a conspiracy without Ferrara's participation.

other criminal statutes. Unlike antitrust conspiracies, conduct that forms the subject matter of these agreements would not be permissible if carried out by a single entity.

5. Spiezio appears to concede that he was capable of conspiring with S & S so long as Ferrara was also a conspirator. (Spiezio Pretrial Brief at 16). This is correct. The evidence showed that Ferrara was a nonmanagement employee of S & S Chemical Inc., was not acting primarily as its agent, and therefore clearly had capacity to conspire with it. The *Carroll* case cited by defendants merely held that an individual had no capacity to conspire with a corporation he used to carry out his own purposes. *United States v. Carroll*, 144 F.Supp. 939 (S.D.N.Y. 1956). Moreover, for the reasons set forth in footnote 4, *infra*, even if Ferrara were acting solely for the corporation's benefit, he could be guilty of conspiring with it.

6. More specifically, there was ample evidence to inculpate Ferrara in the tape recordings of April 23, 1980. First, there was an exchange between Spiezio (S), Ferrara (J), and federal agents O'Connor (O) and Arrison (A) concerning fireworks distribution:

S: (Unintelligible) bootlegger down there making some bad shit.
O: Yeah.

## VI. *AIDING AND ABETTING*

■ Spiezio contends that he cannot be convicted of aiding and abetting the substantive counts of the indictment. He claims that he cannot be convicted of aiding and abetting the very corporation for which he was acting as agent in committing the acts charged.

It is clear that Spiezio's lack of capacity to violate as a principal a statute aimed only at "licensed fireworks manufacturers," will not absolve him of aider and abettor liability. It is well settled that a person may be convicted as an aider and abettor of a crime which he lacks capacity to commit as principal. *E. g., United States v. Lester*, 363 F.2d 68 (6th Cir. 1966), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967).

Spiezio further claims that the two distinct persons, the principal and the helper, required for aiding and abetting under 18 U.S.C. § 2 were not present in the instant case because the principal and the helper were in reality the same individual, Spiezio. This contention must be incorrect. Spiezio cannot have the benefit of a claim that he

S: You know.
J: There a couple kooks in Jersey been turning that shit out down there.

Later in the conversation with the same four persons Spiezio and Ferrara explain to agents O'Connor and Arrison that this business is regulated by ATF:

S: And they check your billings and your products and everything and they see that your straight.
A: Right

. . . .

S: (Unintelligible) . . . set up, and the way they watch ya, you can't make no fuckin money. The only money ya make is bootlegging.
J: Thats it they gotcha.

. . . .

A: These guys are cops?
S: No.
J: ATF?
S: ATF their federal agents
J: Alcohol, Tobacco and Firearms.
O: I don't want no trouble.

These statements by Ferrara and Ferrara's presence during these conversations show Ferrara's knowledge of the unlawful transactions and his intent to participate in the conspiracy to violate 18 U.S.C. § 842(e) and § 842(f).

and the corporation were the same entity without accepting the burden of that claim. In these transactions, if Spiezio the person was in essence Spiezio the corporation, then Spiezio the person was the licensee and would be capable of violating the statute as a principal. The fact that I held the corporation, not Spiezio, to be the licensee means that in my judgment they are sufficiently distinct for one to aid and abet the other. This distinction is immaterial, however, because if Spiezio is deemed to be the corporation then he would be criminally responsible as the principal.

## APPENDIX A

Allentown, Pa., February 23, 1981

Before HON. EDWARD N. CAHN, J.
BENCH OPINION

APPEARANCES:

HOWARD FINKELSTEIN, ESQ.
Assistant United States Attorney
for the Government.
STANFORD SHMUKLER, ESQ.
for defendant Frederick A. Spiezio.
MICHAEL I. LUBER, ESQ.
for defendant John Ferrara.
CALVIN LIEBERMAN, ESQ.
for defendant S & S Chemical, Inc.
ERWIN S. ADLER, ESQ.,
Assistant United States Attorney
for the Government.

THE COURT: It is my practice to make Bench Decisions as soon after the completion of the trial as possible. I reserve the right to edit the Bench Opinion for errors in spelling, grammar and syntax, and to add footnotes in support of the legal position I take in the Bench Opinion.

The Discussion portion of the Bench Opinion is to include any additional Findings of Fact and Conclusions of Law where applicable.

## BENCH OPINION

This criminal case has been tried before me non-jury. Count 1 of the 21-count indictment charges the corporate defendant and two individual defendants with conspiracy in violation of 18 U.S.C. § 371. The indictment alleges that the three defendants conspired to violate or aid and abet the violation of 18 U.S.C. § 842(e) and § 842(f) which provide:

"(e) It shall be unlawful for any licensee knowingly to distribute any explosive materials to any person in any State where the purchase, possession, or use by such person of such explosive materials would be in violation of any State law or any published ordinance applicable at the place of distribution."

"(f) It shall be unlawful for any licensee or permittee wilfully to manufacture, import, purchase, distribute, or receive explosive materials without making such records as the Secretary may by regulation require, including, but not limited to, a statement of intended use, the name, date, place of birth, social security number or taxpayer identification number, and place of residence of any natural person to whom explosive materials are distributed. . . . . "

One of the individual defendants is charged with 10 counts of violating or aiding and abetting the violation of § 842(e) and 10 counts of violating or aiding and abetting the violation of § 842(f).

The indictment refers to ten separate instances involving the alleged distribution of explosive materials. Each distribution, however, is the basis for two counts; one relating to § 842(e) and the other to § 842(f).

I make the following:

## FINDINGS OF FACT

1. The defendants are:
(a) Frederick A. Spiezio.
(b) John Ferrara.
(c) S & S Chemical, Inc.
(S & S)

2. Spiezio was the principal operating officer of S & S at all times material to the charges in the indictment. Spiezio was charged with the substantive offenses in Counts two to twenty-one inclusive.

3. John Ferrara was an employee of S & S at all times material to the charges in the indictment.

4. Commencing June 29, 1979 Mark Fisher an adult individual, purchased explosive materials from S & S and Spiezio, both for his personal use and for resale to others. Fisher was apprehended by agents of the Bureau of Alcohol, Tobacco & Firearms, Department of the Treasury (ATF) on February 25, 1980, and thereafter cooperated with the Government in the investigation of the defendants.

5. On June 29, 1979 a friend of Fisher's introduced Fisher to Spiezio at the S & S premises in Douglassville, Pennsylvania. The purpose of the introduction was to enable Fisher to buy fireworks for the Fourth of July holiday. Fisher purchased three bags of "Big Tans," at $15 per bag. Each bag contained 20 "Big Tans." Fisher described what he bought as being 2¼ inches long and 1¼ inches in diameter. He identified Government Exhibit 9 as a "Big Tan." Although Ferrara was present, there was no discussion involving Ferrara on June 29, 1979.

6. On July 2, 1979 Fisher went to the S & S premises to buy more fireworks. Spiezio said to Fisher that this is "Better than drugs," because you will be "out on the street after a fine." Ferrara took Fisher to a 40-foot truck trailer containing "Big Tans" and smaller fireworks. Ferrara described the fireworks that were for sale. Fisher bought six bags of "Big Tans" and paid Spiezio $90. Fisher, who at that time was a route salesman dealing in potato chips, told Spiezio he was going to resell some of the fireworks along his route.

7. On July 3, 1979, Fisher went to the S & S premises and purchased $150 worth of "Big Tans." Ferrara filled Fisher's order. Fisher paid Spiezio. Spiezio said, "Watch who you sell them to and if you get caught don't say where you got them." On this date Fisher observed a number of persons standing in line with boxes of fireworks waiting to pay Spiezio.

8. Fisher came to the S & S premises toward the end of July, 1979 and purchased a quantity of smaller fireworks known as "Reds." Fisher identified Government's Exhibit G–10–1–B as being "Red" firecrackers.

9. Thereafter, but before August 28, 1979 Fisher went to Spiezio's home near the S & S premises and purchased a case of "Reds" for $300. However, on this transaction Spiezio extended $200 of credit to Fisher.

10. On August 28, 1979 an ATF undercover agent purchased one bag of "Red" firecrackers from Fisher at the Anvil Inn in Kennett Square, Pennsylvania. Fisher had previously purchased these firecrackers from Spiezio.

11. On September 4, 1979 the undercover agent met Fisher at the Anvil Inn. Fisher took the agent to the S & S premises where the agent purchased 4 bags of "Big Tans." Fisher acted as an intermediary during this transaction but did not introduce the agent to Spiezio and Ferrara. Fisher made a profit on the sale in that he paid Spiezio $100 for six bags and resold four bags to the agent for $100, retaining two bags for himself. The agent gave Fisher $10 for Fisher's pocket.

12. On February 25, 1980 the following took place:

(a) Undercover agents arranged to purchase $1000 worth of M–100's from Fisher. Fisher went to the S & S premises where he paid Spiezio the $200 he owed and bought two cases of "Big Tans" for $600. Fisher paid $300 to Spiezio for the goods and owed Spiezio another $300.

(b) Fisher then met the agents at a restaurant. Fisher took the agents to his home. The agents revealed themselves to be with the ATF when it became time to pay Fisher $1000 for the firecrackers.

(c) "Big Tans," a term used by Fisher, and M–100's, a term used by the agents, refer to the same type of firecracker.

(d) Fisher was not placed under arrest but voluntarily returned to the ATF office in Reading, Pennsylvania.

(e) Fisher agreed to take the undercover agents to the S & S premises for the purpose of arranging for one of them to buy M–100's directly from Spiezio.

(f) Fisher introduced one of the undercover agents to Spiezio. Spiezio then sold 10 bags of M–100's to the undercover agent who in turn paid Spiezio. The other undercover agent remained in the automobile and was not introduced to Spiezio.

(g) Ferrara filled the order and discussed the sale of fireworks and various aspects of this activity, stating "We deliver a lotta dogs down there." Dogs is a word which refers to firecrackers.

13. On April 23, 1980 both undercover agents went to the S & S premises. The agent who remained in the automobile on February 25, 1980 was introduced to Spiezio and Spiezio sold him a case of M–100 firecrackers for $300. Ferrara filled the order and discussed problems caused by poorly made firecrackers. Ferrara said last year that he sold $17,000 worth of firecrackers in the Philadelphia area. Ferrara also discussed future contacts by telephone and told the agents to pick up an S & S business card in the office.

14. On June 10, 1980 both agents came to the S & S premises and arranged for a purchase of $5000 worth of firecrackers including M–100's. The agents identified themselves to Spiezio after the order was filled, and the goods placed in the agents' truck, but before the money was delivered to Spiezio.

15. Spiezio did not obtain any information or complete any records relating to ATF Form 4710 in regard to any of the sales to Fisher and the undercover agents referred to above.

16. Qualitative analysis of the firecrackers sold by Spiezio revealed that they contained a perchlorate explosive mixture which is an explosive material contained on the lists compiled pursuant to 18 U.S.C. § 841(d).

17. (a) Government Exhibit 15, an M–80, contained 4.1 grams of perchlorate explosive mixture.

(b) Government Exhibit 16, an M–100, contained 21.3 grams of perchlorate explosive mixture.

18. Government Exhibits 7, 8, 9, 10, 11, 15 and 16 are devices whose primary purpose is to function by explosion, and all of them contained in excess of two grains of perchlorate explosive mixture.

19. Spiezio had a specific intent to violate § 842(e) and § 842(f).

## DISCUSSION

Most of the facts are not in dispute. Tape recordings from body wires have been made of the conversations which took place during most of the important transactions. However, the defendants take issue with the evidence presented by the Government in two respects. They urge that Fisher's testimony should be rejected because it is tainted both by prior wrongdoing and by an agreement with the Assistant United States Attorney not to prosecute him in exchange for complete cooperation. The defendants also urge that I erred by allowing the Government to exhibit motion pictures taken at Fort Dix, New Jersey, depicting explosions of the firecrackers involved in this case.

I find Fisher's testimony to be credible. It had the ring of truth to it that judges tell jurors to look for. It was generally consistent with the tape recordings and with the other evidence in the case. Of course, it was not 100 percent consistent, but the deviations were not on significant matters. It is true Fisher testified he was told that it was for the judge to determine if he would be prosecuted, but I believe this was a matter of misunderstanding and not falsehood. As the Fact Finder I am permitted to accept Fisher's testimony as credible even if it is tainted, and even if I am required to scrutinize it carefully.

The admissibility of the motion pictures is a more difficult question because the ATF expert added CD–4 (a military explosive) to make sure all of the fireworks would explode. Three large explosions were filmed. Each consisted of about 2500 firecrackers

purchased or seized from S & S and Spiezio plus the CD–4. In addition, three individual firecrackers were attached to a mannequin, and they were exploded individually with the result that the mannequin was blown to bits.

This demonstrative evidence would not ordinarily be admissible, except the defendants deny that the firecrackers are explosive materials within the meaning of § 842(e) and § 842(f) and contend that the regulations of the Secretary of the Treasury relating to firecrackers are unreasonable. The films demonstrated the explosive capabilities of firecrackers and illustrated the dangers connected with their use. While the CD–4 made the three explosions more violent and while the mannequin may have been more susceptible to damage than a human body, the Fact Finder, be it jury or judge, can make an appropriate evaluation of the films. I hold that the admissibility of this evidence was proper, especially in light of the defenses raised in this proceeding and the expert's explanation of the effect of the CD–4 on the three large explosions.

All three defendants contend that Congress lacks authority under the commerce clause to regulate intrastate sales of explosive materials by legislation containing criminal sanctions. All of the transactions involved in this proceeding are intrastate in nature. There is no proof that any purchaser took or intended to take the explosive materials across state lines. The fact that the agents took the explosive materials to Fort Dix to explode them would not make these transactions interstate. Nor is there any proof that any of the components involved in the manufacture of the explosive materials have been transported in interstate commerce.

The Government contends that Congress has made a reasonable determination that unlawful use of explosive materials has been a burden on interstate commerce, that this determination is reasonable, and that therefore Congress has power over solely intrastate transactions involving explosive materials.

I hold that the Government is correct. As early as *Houston, East and West Texas Railroad Company v. United States*, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), it was determined that Congress had the power to regulate solely intrastate rates to protect persons and places in interstate commerce from discriminatory transportation charges. Over 25 years later, in *United States v. Darby*, 312 U.S. 100, 119, 120, 61 S.Ct. 451, 459, 460, 85 L.Ed. 609 (1941) Justice Stone said:

"But long before the adoption of the National Labor Relations Act this Court had many times held that the power of Congress to regulate interstate commerce extends to the regulation through legislative action of activities intrastate which have a substantial effect on the commerce or the exercise of the Congressional power over it."

See also *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

In *United States v. Perez*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) Justice Douglas decided that Congress had power over purely intrastate extortionate credit transactions because of their effect on interstate commerce. Relying on *Perez*, the Court in *United States v. Dawson*, 467 F.2d 668 (8th Cir. 1972) upheld the constitutionality of 18 U.S.C. § 842(h), which prohibits transactions involving explosive materials which are known to be stolen, even though the act applies to solely intrastate activity. The *Dawson Court* reviewed the legislative history and found the conclusions of Congress to be reasonable as to the effect of explosive materials on interstate commerce even if no precise factual findings were made. The defendants argue that it is unreasonable to extend the federal commerce power to firecrackers as opposed to explosives. The record in this case, however, reveals that the M–100 can easily be made into a grenade-type device by coating it in glue and then rolling it in beebees or by attaching nails to its exterior. It was reasonable for Congress to delegate to the Secretary of the Treasury the responsibility to compile a list of explosive materials, and

it was reasonable for the Secretary to include a perchlorate explosive mixture on the list.

There remains the question of whether *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) changes the foregoing precedent. That case held it would be unconstitutional to apply the Fair Labor Standards Act to state and municipalities, because to do so would interfere with their sovereignty. In the case at bar, there is no interference with the sovereignty of Pennsylvania which also has established criminal sanctions for the sale of this type of firecracker. See 35 P.S. § 1271 et seq. The sovereignty of Pennsylvania is therefore reinforced and not undermined by these federal statutes. I conclude that § 842(e) and § 842(f) are *not* unconstitutional on the ground that Congress lacks authority to regulate intrastate sales of explosive materials. Defendants also urge that it violates Equal Protection concepts if non-licensees are permitted to sell explosive materials under federal law while the prohibition applies only to licensees. This assertion is incorrect because § 842(a)(1) makes it unlawful to deal in explosive materials without a license.

The defendants contend, not in oral argument but in their briefs, that 18 U.S.C. § 842(e) is invalid because it conditions the unlawfulness of a distribution of explosive materials on whether the purchase, possession or use by the distributee is in violation of the law of the state where the distribution takes place. Chief Justice Hughes dealt with this argument in *Kentucky Whip and Collar Company v. Illinois Central Railroad Company*, 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270 (1937) which sustained federal legislation making it unlawful to transport convict-made goods into any state where the sale or possession of such goods violated state law. The Chief Justice held:

"The Congress has not sought to exercise a power not granted or to usurp the police powers of the States. It has not acted on any assumption of a power enlarged by virtue of state action. The Congress has exercised its plenary power which is subject to no limitation other than that which is found in the Constitution itself. The Congress has formulated its own policy and established its own rule. The fact that it has adopted its rule in order to aid the enforcement of valid state laws affords no ground for constitutional objection."

Also, 18 U.S.C. § 1955 et seq., which makes it a federal crime to conduct a gambling business in violation of state law has been held to be constitutional in the face of an attack that there is an unlawful delegation to the states of congressional power. *United States v. Avarello*, 592 F.2d 1339, 1345 (5th Cir. 1979) cert. denied, 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979).

Each of the defendants contend that the statutory and regulatory scheme is void for vagueness. According to the defendants, no one can ascertain with reasonable certainty whether or not certain chemical compounds are included in the statutory and regulatory definition of explosive materials.

In the first place the recorded conversations make it clear that Spiezio and Ferrara did know that the sale of large firecrackers like M–80's and M–100's was unlawful.

In the second place, I find the statutory and regulatory scheme both clear and reasonable. § 841(d) defines explosives to mean "any chemical compound, mixture or device, the primary or common purpose of which is to function by explosion." § 841(d) then sets forth specific examples of explosives and grants the Secretary the authority to publish annually a list of those specific explosives and any additional explosives "he determines to be within the coverage of this chapter." The combination of perchlorate, aluminum and sulfur (flash powder) has been contained on the Secretary's list as an explosive perchlorate mixture from 1971 to the present. The Government has proved that the firecrackers sold by the defendants contained this explosive perchlorate mixture.

The defendants maintain that the firecrackers involved are exempt. I reject this contention because 27 C.F.R. 181.141(a)(7) exempts only those fireworks commonly

sold for personal use "in compliance with State laws. . . ." The defendants do not meet this test in two respects. The sales in this case violate 35 P.S. § 1271 et seq., a State law, and the defendants knew the sales they made to Fisher and the undercover agents were, for the most part, for resale rather than personal use. Nor does ATF Ruling 79–8 provide an exemption because the size of the firecrackers in this case exceeds ½ inch in length and ¼ inch in diameter, and the explosive perchlorate mixture exceeds two grains. Furthermore, references in ATF Ruling 79–8 to Department of Transportation Regulations at 49 C.F.R. 173.100(r) does not undermine the validity of the regulatory scheme because it is consistent with the ATF Regulations in regard to the definition of explosives in the amount of two grains or less.

The defendants argue that it is unreasonable for Congress in 18 U.S.C. § 845(a)(5) and Secretary in 27 CFR 181.141(b) to exempt 50 pounds of black powder "intended to be used solely for sporting, recreational or cultural purposes in antique firearms, as defined in 18 U.S.C. § 921(a)(16) or in antique devices, as exempted from the term "destructive device" in 18 U.S.C. § 921(a)(4). . ." The defendants suggest that to exempt 50 pounds of black powder and prohibit more than two grains of flash powder is arbitrary and capricious. I disagree. The exemption for black powder is limited to intended use with antique firearms and antique devices. This exemption as limited is reasonable on its face, is within the Secretary's discretion, and has been specifically approved by Congress.

The defendants have directed my attention to several other areas which they think makes the statutory and regulatory scheme confusing to the extent that it is incomprehensible. The defendants refer to a mistake in the manual on page 67. While there is a mistake in referring to a regulation, that mistake was caused by the renumbering of the regulations, and when the entire scheme is considered in context, this mistake does not make the scheme unconstitutionally vague. Nor may the defendants conjure up close questions which are not present in the case at bar to attack the constitutionality of the legislative scheme. Also, the defendants' contention that the sales made by the defendants to Fisher and the undercover agents are lawful under 35 P.S. § 1275 is not tenable as illustrated by a reading of that statute. Nor does it help the defendants to argue that there is a variation in the terminology of 35 P.S. § 1272 and the allegations set forth in the even counts of the indictment.

The indictment refers to the "purchase, possession and use of explosive materials." While 35 P.S. § 1272 refers to "offer for sale, expose for sale, sell at retail, or use or explode any fireworks." I hold that the indictment is sufficient to allege an offense under the Pennsylvania statute.

The defendants further contend that the phrase explosive perchlorate mixture might not be an explosive material depending on the percentages of the elements which make up this mixture. While that might be true in extreme cases, it is clear and defendants have admitted that the firecrackers in this case will explode.

Finally, the defendants urge that Congress failed to use the word "fireworks" in the statute under which the defendants in this case are charged. Defendants maintain that Congress has used the word "fireworks" at 18 U.S.C. § 836. Thus, according to the defendants, Congress did not intend to mean that fireworks were included in the statutes involved in the proceedings before me. I reject this contention. I think that there are definitional problems in regard to describing fireworks. I think it was appropriate for Congress to describe explosive materials in terms of the materials themselves rather than to use the term fireworks.

Spiezio contends he is not a "licensee" under 18 U.S.C. § 842(e) nor a "licensee or permittee" under 18 U.S.C. § 842(f). Spiezio is correct because the license was issued to S & S alone and he executed the application in his capacity as a corporate officer.

However, the Government contends Spiezio aided and abetted S & S, the licen-

see, in violating § 842(e) and § 842(f). The elements of aiding and abetting are:

1. The defendant knew the venture was occurring;

2. He associated himself with the act;

3. He participated in it as something he wished to bring about;

4. He committed some overt act to make it a success.

See *United States v. Belt*, 574 F.2d 1234, 1240 (5th Cir. 1978). Spiezio clearly fits this definition. He knew the sales to Fisher and the undercover agent were occurring, and he knew the sales were unlawful. He associated himself with the sales. He participated in the sales by receiving the proceeds, and he acted to bring the sales to a successful conclusion.

Spiezio claims, however, that he cannot be guilty of aiding and abetting in regard to an offense for which he could not be found guilty as a principal. He maintains that because he is not a licensee by definition, he cannot be guilty of the substantive offense under § 842(e) and § 842(f). The law is to the contrary. See *United States v. Burkhalter*, 583 F.2d 389 (8th Cir. 1978) where one aiding and abetting the transfer of firearms without payment of transfer tax could be convicted even though the tax is levied on the transferor.

Spiezio contends that all of the counts relating to § 842(f) should be dismissed because the reporting requirements constitute self-incrimination in violation of the Fifth Amendment. This is a very troubling aspect of these proceedings. And as the Supreme Court observes in *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), "The judicial scrutiny is invariably a close one."

I believe, however, that the statute in this case is directed to essentially non-criminal activity. The explosives industry and the public display of fireworks are not in-herently criminal. Nor has Congress selectively directed its regulatory scheme to any criminal group. As in the Internal Revenue Service context, there is a need for the maintenance of regularly kept records ·to keep track of dangerous explosives. The defendants chose to engage in a lawful activity in an unlawful manner. That illegality may not now be used to excuse them from the mandated disclosure requirements, even though such disclosures could lead to criminal prosecution. See *U. S. v. Stirling*, 571 F.2d 708 (2nd Cir. 1978).

Spiezio also claims that the distributee is the person required to complete Form 4710 under 27 CFR 181.105(b), and that the antecedent of the word "he" in 181.26(a) refers to the distributee. Considering all of the regulations and the statutes as well as the text of Form 4710, it is clear to me that the licensee has the responsibility to keep and maintain the records in accordance with § 842(f) and the regulations adopted thereunder. The regulatory scheme contemplates that the person to whom the licensee sells or otherwise transfers the explosive material must fill in part of the form and then the licensee must sign the form, send the original to ATF and keep a copy for himself.

Each of the defendants contends that the Government has failed to prove beyond a reasonable doubt that a conspiracy existed. The Government urges there was one overall conspiracy involving Spiezio, Ferrara, the corporate defendant, and Mark Fisher who is alleged to be an unindicted co-conspirator. In a Bill of Particulars the Government stated the conspiracy ended on February 25, 1980, the date of Fisher's arrest.

I find that Fisher was not a conspirator. He was not a partner in pursuing the criminal activity of manufacturing and selling firecrackers containing explosive materials contrary to the statute and regulations. On the other hand, S & S, Spiezio, and Ferrara were engaged in this joint criminal activity.

The three defendants formed a group for the purpose of carrying out the illicit activity described in the Findings of Fact above. Spiezio has convinced me that he is not the licensee. However, as an employee of the licensee he joined with the licensee to commit a substantive offense under § 842(e) and the substantive offense under § 842(f) in regard to Counts 2 through 21 inclusive of the indictment.

Ferrara claims that the Government proved no more than he was a mere employee who was following the directions of his superior. The evidence is to the contrary. I must, of course, view the evidence as to each conspirator separately. In doing so, I may consider Ferrara's own statements as recorded on the body wires and as testified to by the live witnesses. Ferrara was more than a mere ordertaker. He was heavily involved in the sale of firecrackers before the conspiratorial period took place, and there is no reason to think that he terminated the conspiracy before that date. He explained what merchandise was for sale, he discussed various aspects of business, he talked about his involvement in the sale of firecrackers, and he consistently used the phrase "we." I find that all three defendants are co-conspirators.

I reach the following Conclusions of Law:

1. This Court has jurisdiction over the subject matter of this case and the persons of the defendants.

2. Proper venue lies in this Court.

3. Congress may regulate under the Commerce Clause of the Constitution, intrastate transactions involving explosive materials because Congress has determined that the unlawful use of explosive materials has deleteriously affected interstate commerce.

4. 18 U.S.C. § 842(f) is not invalid, in the context of this case, on the ground it requires a defendant to incriminate himself.

5. The statutory and regulatory scheme dealing with explosive materials is reasonable and is not void for vagueness.

6. The defendants Frederick A. Spiezio, John Ferrara and S & S Chemical, Inc. conspired to violate and conspired to aid and abet the violation of 18 U.S.C. § 842(e) and § 842(f) as charged in Count 1 of the indictment.

7. Frederick A. Spiezio is guilty of aiding and abetting the violation of 18 U.S.C. § 842(e) and § 842(f) as charged in Counts 2 to 21 of the indictment inclusive.

As a result of my Bench Opinion I will enter an Order tomorrow and entering findings of guilty in accordance with the Conclusions of Law just dictated.