In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3255

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ANTHONY L. BOOKER,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 99 CR 30238--William D. Stiehl, Judge.

Argued January 19, 2001--Decided April 24, 2001

Before FLAUM, Chief Judge, and POSNER and RIPPLE,
Circuit Judges.

RIPPLE, Circuit Judge.  Anthony Lamar Booker
pleaded guilty to one count of possession of
cocaine base ("crack") with intent to distribute
within 1,000 feet of a public housing facility,
in violation of 21 U.S.C. sec.sec. 841(a)(1) and
860, and to one count of being a felon in
possession of a weapon in violation of 18 U.S.C.
sec. 922(g)(1). The district court sentenced Mr.
Booker to 168 months' imprisonment, and Mr.
Booker now appeals several aspects of his
sentence. For the reasons set forth in the
following opinion, we affirm the judgment of the
district court.

I
BACKGROUND
A.  Facts

This case began with several anonymous phone
calls made to the Metropolitan Enforcement Group
of Southwestern Illinois ("MEGSI"), a division of
the East St. Louis, Illinois, police department.
The anonymous callers alleged that drugs were
being sold out of a house located at 1015 Bond
Avenue in East St. Louis ("the house" or "the
drug house")./1 MEGSI Agent Tony Mino contacted
a confidential informant who told Agent Mino that
he would assist him in conducting controlled drug
buys from the house. The informant also told

Agent Mino that Mr. Booker and another man named Doug were the individuals selling drugs from the house.

The Government's informant conducted three controlled buys. The first occurred on November 2, 1999. The informant went to the drug house in order to purchase $100 worth of crack. The informant walked into the house and saw Mr. Booker; Mr. Booker sold him 1.4 grams of crack. While the informant was in the house, he saw a firearm that he thought was an AK-47 on the couch next to Mr. Booker.

The second controlled buy took place approximately seven hours later on November 2. The informant again went back to the drug house to purchase $100 worth of crack, and Mr. Booker sold the informant 1.5 grams of crack. While inside the house, the informant saw Doug as well as three other individuals. The firearm that the informant had seen earlier in the day still was on the couch.

The last controlled buy took place the next day, November 3. The informant again went back to the drug house and purchased 1.5 grams of crack from Mr. Booker. While inside the house, the informant saw Doug, Doug's brother, and another man. According to the informant, Doug had approximately 4 ounces of crack out on a table that he was "cutting up" into smaller, resale portions. Tr.2 at I-18. The informant also saw two firearms in the house. The weapon he thought was an AK-47 was "in the corner" with Mr. Booker, and another man was holding a gun that the informant thought was a Tech Nine. Id.

Following this third controlled buy, Agent Mino obtained a search warrant for the house. As the law enforcement officers executing the warrant approached the house, they saw Mr. Booker standing in front of it with two other people. When Mr. Booker saw the officers, he started running from the house and threw to the ground a bag containing 1.5 grams of crack. Doug ran out the back door of the house. Just outside the back door of the house, the officers found a bag containing 19 grams of crack. Inside the house, the officers found a Norinco 9mm semiautomatic firearm.

Mr. Booker was eventually apprehended. He voluntarily gave a statement to the police in which he admitted that he had started selling crack from the house for Doug about five days prior to his arrest as a means of supplying his own crack habit./2 He also admitted that he had picked up one of the firearms in the house because he thought it was ugly, and he wanted to

look at it. He further admitted that he had thrown the bag containing the 1.5 grams of crack as he was trying to evade the officers. Mr. Booker acknowledged that Doug had run out the back door. Although Mr. Booker claimed that someone else also had run out that door, Agent Mino testified at Mr. Booker's sentencing hearing that Doug was the only one.

B. Earlier Proceedings

Mr. Booker was charged by indictment with one count of possession of crack with intent to distribute within 1,000 feet of a public housing facility and with one count of being a felon in possession of a weapon. Mr. Booker pleaded guilty to both counts without the benefit of a plea agreement. The district court ordered that a presentence report ("PSR") be prepared. The PSR recommended that, pursuant to United States Sentencing Guideline sec. 1B1.3, Mr. Booker's relevant conduct include 24.9 grams of crack: the 4.4 grams from the three controlled purchases, the 1.5 grams Mr. Booker threw to the ground as he attempted to avoid arrest, and the 19 grams recovered near the back door of the house. Accordingly, the PSR set Mr. Booker's base offense level at 28. See U.S.S.G. sec. 2D1.1(c)(6). The PSR recommended that this offense level be increased two levels for possession of a dangerous weapon during a drug offense pursuant to sec. 2D1.1 (b)(1). Lastly, the PSR suggested that Mr. Booker was not entitled to a three-level reduction for acceptance of responsibility pursuant to sec. 3E1.1(b) because he initially had refused to give a statement to the probation department, had contested his responsibility for the 19 grams found by the back door, and had insisted that the gun recovered from the house was not involved in his drug sales./3

Mr. Booker objected to each of these recommendations. The district court, however, overruled Mr. Booker's objections and adopted the PSR's recommendations. The court held that the 19 grams of crack found by the back door of the house were part of the illegal drug sales Mr. Booker and Doug jointly undertook and thus constituted relevant conduct within the meaning of sec. 1B1.3(a)(1)(B). The court also concluded that the firearm recovered from the house was there for the protection of the individuals who were selling drugs from the house; therefore, its presence during Mr. Booker's drug sales to the informant was sufficient to warrant the two-level enhancement for possession of a dangerous weapon during a drug offense. Finally, the district court refused to reduce Mr. Booker's sentence for acceptance of responsibility because Mr. Booker

had contested the fact that he was responsible for the 19 grams of crack recovered from behind the house and had denied that the gun was connected to his illegal drug trafficking. Based on these determinations, the court set Mr. Booker's offense level at 32, which, when coupled with his criminal history category of IV, produced a guideline range of 168 to 210 months. The court sentenced Mr. Booker to 168 months' imprisonment.

II
DISCUSSION

Mr. Booker appeals the district court's inclusion of the 19 grams found by the back door of the house as part of his relevant conduct, the court's imposition of the two-level enhancement for possession of a dangerous weapon during a drug offense, and the court's refusal to grant a reduction for acceptance of responsibility. We examine each of his arguments.

A.   Relevant Conduct

The 19 grams of crack found near the back door of the drug house were included as part of Mr. Booker's relevant conduct pursuant to U.S.S.G. sec. 1B1.3(a)(1)(B). The district court held that Mr. Booker and Doug jointly undertook an illegal activity, the sale of crack. The district court believed that the 19 grams found behind the house belonged to Doug and that it was foreseeable to Mr. Booker that those 19 grams would end up in his hands for resale. On appeal, Mr. Booker insists that the 19 grams did not belong to him and must have belonged to one of the other individuals who frequented the drug house. We review a district court's calculation of the quantity of drugs attributable to a defendant for clear error. See United States v. Berthiaume, 233 F.3d 1000, 1002 (7th Cir. 2000).

The Sentencing Guidelines direct that, in the case of a jointly undertaken criminal activity, a defendant's offense level should take account of the reasonably foreseeable acts and omissions of other offenders taken in furtherance of the joint activity. See U.S.S.G. sec. 1B1.3(a)(1)(B). "A 'jointly undertaken criminal activity' is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." Id. at cmt. n.2.  Section 1B1.3(a)(1)(B) requires the sentencing court to determine the scope of the criminal activity the defendant agreed to undertake jointly, then to determine whether the acts or omissions of the other participants were foreseeable to the defendant. See id.; see also United States v. Thomas, 199 F.3d 950, 953 (7th

Cir. 1999). If the conduct was both part of the jointly undertaken activity and foreseeable to the defendant, the court must include it as part of the defendant's relevant conduct. See U.S.S.G. sec. 1B1.3(a)(1)(B), cmt. n.2 ("With respect to offenses involving contraband (including controlled substances), the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.").

The district court concluded in this case that Mr. Booker and Doug jointly undertook the criminal activity of selling crack. This conclusion was well-supported in light of Mr. Booker's own admission that he had been selling crack for Doug for almost a week prior to his arrest. Thus, the 19 grams found by the back door of the house are attributable to Mr. Booker if they were a foreseeable part of the joint undertaking./4 We do not believe the district court clearly erred in concluding that they were. Mr. Booker sat in the room with Doug as Doug cut up approximately 4 ounces of crack into smaller portions for resale. Those 4 ounces were roughly equivalent to 116 grams. Mr. Booker's admitted relationship with Doug, his repeated presence at the house with Doug over a two-day period, and his presence in the room while Doug prepared resale portions of crack support the district court's conclusion that Mr. Booker must have expected that some or all of the resale portions Doug was preparing would end up in his hands to sell. Therefore, the district court did not clearly err in attributing to Mr. Booker the 19 grams found by the back door.

B.  Possession of a Dangerous Weapon

Mr. Booker objects to the district court's enhancement of his sentence pursuant to its determination that he possessed a dangerous weapon in connection with a drug offense. See U.S.S.G. sec. 2D1.1(b)(1). He argues that, although he may have fleetingly touched the firearm recovered from the house, the gun was not in any way connected to his drug sales. We review the district court's determination that the defendant possessed a weapon in connection with a drug offense for clear error. See United States v. Adams, 125 F.3d 586, 596 (7th Cir. 1997).

The Sentencing Guidelines require a sentencing court to increase a defendant's offense level by two levels if the defendant possessed a dangerous weapon in connection with a drug offense. See U.S.S.G. sec. 2D1.1(b)(1). "The adjustment should

be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Id. at cmt. n.3. The Government bears the initial burden of demonstrating that the defendant "possessed a weapon in a place where drugs were present"; once the Government meets its burden, the defendant must demonstrate that it was clearly improbable that the weapon was connected to the offense. United States v. Grimm, 170 F.3d 760, 767 (7th Cir. 1999).

We have recognized consistently that guns found in close proximity to illegal drugs are presumptively considered to have been used in connection with the drug offense. See United States v. Johnson, 227 F.3d 807, 814 (7th Cir. 2000), petition for cert. filed (U.S. Feb. 12, 2001) (No. 00-8513); United States v. Zehm, 217 F.3d 506, 517 (7th Cir. 2000); Grimm, 170 F.3d at 767; Adams, 125 F.3d at 597; United States v. Ewing, 979 F.2d 1234, 1238 (7th Cir. 1992). This presumption follows from the prevalent role firearms play in drug trafficking. "[D]rug dealers often carry weapons to protect themselves and their large amounts of drugs and cash." United States v. Cantero, 995 F.2d 1407, 1412 (7th Cir. 1993).

In this case, the Government's informant saw a gun on the couch next to Mr. Booker during his first two purchases of crack from Mr. Booker. During the informant's third purchase, he saw a gun near Mr. Booker as Doug was cutting up large amounts of crack into smaller portions on a table nearby. The gun's proximity to Mr. Booker and to the drugs during Mr. Booker's sales to the informant gave Mr. Booker the ability to use the weapon in an instant if he felt his personal safety or his illegal product was threatened. It is this increased chance that firearms will be used if they are present during drug trafficking that the enhancement in sec. 2D1.1(b)(1) is designed to address. See U.S.S.G. sec. 2D1.1(b)(1), cmt. n.3 ("The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons."). Given the presumption that arises as a result of the proximity of the gun to Mr. Booker and to the drugs during the controlled buys, Mr. Booker has failed to demonstrate that it is clearly improbable that the gun was used in connection with the drug offense. Consequently, the district court did not clearly err in imposing sec. 2D1.1 (b)(1)'s two-level enhancement.

C. Acceptance of Responsibility

Mr. Booker maintains that he should have

received a three-level reduction in his base offense level for acceptance of responsibility because he never challenged the facts underlying his convictions; instead, he merely raised good faith legal objections to the conclusions that should be drawn from those facts. Mr. Booker also points out that he voluntarily gave a statement to the police shortly after his arrest, he quickly informed the Government that he wished to plead guilty, he assisted the Government by providing information as to Doug's whereabouts, and he consistently admitted his guilt from the time of his arrest to the time of his sentencing. The district court, however, apparently did not believe that Mr. Booker's cooperation in these instances was sufficient to outweigh his other protests. The court concluded that Mr. Booker's objections to the inclusion of the 19 grams as relevant conduct and to the imposition of the weapon enhancement were denials of relevant conduct that were incompatible with an acceptance of responsibility. We review the district court's assessment for clear error. See United States v. Williams, 202 F.3d 959, 961 (7th Cir. 2000).

Mr. Booker correctly asserts that a defendant should not be denied a reduction for acceptance of responsibility when he only challenges the legal conclusion that should be drawn from facts that he has admitted. See United States v. Purchess, 107 F.3d 1261, 1266 (7th Cir. 1997). However, a defendant also must admit, or not falsely deny or frivolously contest, any relevant conduct as it relates to the offense of conviction to be eligible for an acceptance-of-responsibility reduction. See U.S.S.G. sec. 3E1.1, cmt. n.1(a); see also United States v. Sierra, 188 F.3d 798, 804 (7th Cir. 1999). Although the Sentencing Guidelines do not require the defendant affirmatively to volunteer information about his relevant conduct, see U.S.S.G. sec. 3E1.1, cmt. n.1(a), "[i]f a defendant denies relevant conduct and the court determines such conduct occurred, the defendant cannot claim to have accepted responsibility for his actions," United States v. Brown, 47 F.3d 198, 204 (7th Cir. 1995). See also Sierra, 188 F.3d at 804 ("A defendant does not accept responsibility when he denies committing criminal actions and relevant conduct which the district court attributes to him.").

Mr. Booker has done many of the things the courts and the Guidelines expect a defendant to do in order to demonstrate that he accepts responsibility for his illegal conduct. See U.S.S.G. sec. 3E1.1, cmt. n.1 (explaining that, in determining whether to grant an acceptance-of-responsibility reduction, the sentencing court should consider, inter alia, whether the

defendant truthfully admitted the conduct comprising the offense of conviction, whether he provided voluntary assistance to the authorities, and whether he manifested his acceptance of responsibility in a timely manner). Indeed, Mr. Booker's cooperation with the Government makes this issue a closer, and more sympathetic, one than it otherwise might have been. However, the timely entry of a guilty plea is not necessarily sufficient to warrant an acceptance-of-responsibility reduction. See id. at cmt. n.3 ("A defendant who enters a guilty plea is not entitled to an adjustment [for acceptance of responsibility] as a matter of right."). Instead, the defendant must demonstrate to the district court's satisfaction that he accepts responsibility for his conduct in a moral sense. See United States v. Fiore, 178 F.3d 917, 925 (7th Cir. 1999). "Unlike the district court judge, we do not enjoy a front row seat from which to assess [the defendant's] statements and demeanor." Williams, 202 F.3d at 961-62 (quoting United States v. Cunningham, 103 F.3d 596, 598 (7th Cir. 1996)) (internal quotation marks omitted). Because "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," we give the district court's determination in this regard "great deference." U.S.S.G. sec. 3E1.1, cmt. n.5; see also Williams, 202 F.3d at 961.

The objections Mr. Booker raised before the district court essentially boil down to denials of the facts comprising relevant conduct that the district court ultimately attributed to him. Mr. Booker denied the fact that the 19 grams found by the back door belonged to Doug and were part of their joint venture in crack distribution. He also denied the fact that the firearms inside the house were there to protect the drugs and the individuals who were selling them, including himself. Although a defendant is free to challenge the Government's proffer of relevant evidence, doing so "exposes his denials to the scrutiny of the court." Brown, 47 F.3d at 204. We previously have held that a district court does not err in refusing an acceptance-of-responsibility reduction if it finds the defendant's denials meritless. See id. We are bound by our prior precedent, as well as by the great degree of deference we give to the sentencing court in these matters, to conclude that the district court did not clearly err in refusing to grant Mr. Booker a reduction for acceptance of responsibility.

Conclusion

The district court committed no clear error in attributing the 19 grams of crack found by the

back door of the house to Mr. Booker, in applying the two-level enhancement for possession of a weapon, or in denying a three-level reduction for acceptance of responsibility. Accordingly, we affirm the judgment of the district court.

AFFIRMED

/1 The house was within 1,000 feet of a public housing facility.

/2 Doug apparently repaid Mr. Booker for his services with crack and Absolut vodka rather than with money.

/3 Mr. Booker's offense level was also increased by two levels because the drug transactions occurred within 1,000 feet of a protected location. See U.S.S.G. sec. 2D1.2(a)(1). Mr. Booker has not challenged this enhancement on appeal.

/4 Mr. Booker suggests that there is insufficient evidence to connect the 19 grams to Doug. However, Mr. Booker admitted to Agent Mino that Doug ran out the back door of the house when the officers approached. Although Mr. Booker also insisted that at least one other person ran out the back door, Agent Mino testified at Mr. Booker's sentencing hearing that only one person did so. It was within the district court's province to credit Agent Mino's testimony over Mr. Booker's. Because there is support in the record for the district court's conclusion that the 19 grams belonged to Doug, we are unable to say that this finding is clearly erroneous.