In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 01-3540, 01-3608, 01-3833, 02-2017 and 02-2018

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AJA E. FUDGE, LAMONT C. GORDON,
EDWARD L. MCCHRISTIAN, and RODNEY R. RAINES,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Western District of Wisconsin.
Nos. 01-CR-9 and 01-CR-98—**Barbara B. Crabb**, *Chief Judge.*

ARGUED JANUARY 23, 2003—DECIDED APRIL 10, 2003

Before BAUER, CUDAHY, and COFFEY, *Circuit Judges.*

BAUER, *Circuit Judge.* This consolidated appeal stems from a 35-count indictment against eleven individuals. The defendants were involved in a major cocaine ring operating in Madison, Wisconsin. Four of the defendants pleaded guilty and were sentenced to various prison terms. On this appeal, three challenge the district court's decision to deny a downward departure in their sentences. Individually, each appellant raises particular issues concerning their respective convictions and sentences. For the reasons stated herein, we affirm the district court on all aspects.

## BACKGROUND

The P-Stone Nation branch involved in this case is a gang located in Madison, Wisconsin. It had a niche in the crack cocaine market and when the federal government became aware of its business it began to investigate. The investigation entailed, among other things, undercover buys of crack cocaine, surveillance, a telephone trap and trace, arrests, and a Title III wiretap on three cellular phones. It was this last method, the Title III wiretap, that has become the source of much consternation in this appeal. How the government obtained the wiretap deserves adequate explanation.

On May 8, 2002, the government filed a sworn application requesting authorization to intercept communications from three telephones. The application asserted:

> Pursuant to Section 2516 of Title 18, United States Code, the Attorney General of the United States has specially designated the Assistant Attorney General, any acting Assistant Attorney General, any Deputy Assistant Attorney General, or any acting Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred on the Attorney General by Section 2516 of Title 18, United States Code, to authorize this application. Under the power designated to him by special designation of the Attorney General pursuant to Order Number 95-1950 of February 13, 1995, an appropriate official of the Criminal Division has authorized this application. Attached to this application are copies of the Attorney General's order of special designation and the memorandum of authorization approving this Application.

The application included a May 5, 2000 letter from the Assistant Attorney General, Criminal Division, to the Director of the Office of Enforcement Operations, signed by a Deputy Assistant Attorney General. Also attached to

the application was a cover letter to the United States Attorney for the Western District of Wisconsin, signed by Frederick D. Hess, Director of the Office of Enforcement Operations, indicating that "a duly designated official of the Criminal Division has authorized an application to be made to a federal judge of competent jurisdiction for an order under § 2518 of Title 18. . . ." The application also contained a copy of order number 1950-95, signed by then Attorney General Janet Reno. In addition, the affidavit of Shawn B. Johnson, the FBI's lead agent in the P-Stone Nation investigation was filed with the application. The 46-page affidavit detailed the basis for the application and the incriminating evidence the government had obtained.

The court granted the application and issued an order which authorized the interception. The order indicated that the authorization was:

> Pursuant to an application authorized by a duly designated official of the Criminal Division, United States Department of Justice, pursuant to the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by sec. 2516 of Title 18, United States Code, to intercept wire communications.

With the wiretap in place, the government proceeded in its investigation and infiltration of the conspiracy. The government learned that Defendant-Appellant Aja Fudge sold crack cocaine to three customers during the conspiracy. She also aided co-defendants Gordon, Winfield, Baker and Daniels in obtaining crack cocaine for resale from co-defendant Rodney Raines. In addition, Fudge assisted Raines in collecting drug profits, procuring rental cars, and answering customer complaints. In all, 40.2 grams were purchased directly from Fudge.

In addition, officials learned that Defendant-Appellant Gordon sold a $20 cocaine rock to an inveterate purchaser

on a weekly basis. Evidence adduced from the wiretap revealed Gordon incessantly discussing drug transactions with co-defendants Davis and Baker. After Gordon's arrest on January 22, 2001, he made a full confession about his drug activities. He admitted to having ten regular customers, moonlighting as a backup to the P-Stones when they were out of cocaine or were unavailable. He also acknowledged that his source for cocaine was co-defendant Rodney Raines.

During the course of the investigation, approximately 166 grams of crack cocaine were purchased, seized, or obtained from Defendant-Appellant Edward McChristian. Links between various co-conspirators and McChristian were also established through the wiretap.

Finally, Defendant-Appellant Rodney Raines sold crack cocaine to four customers, and had close relationships with many of the co-defendants. From December 1999 to April 2000, Raines brought four to six ounces of cocaine back to Madison from Chicago on many occasions. Raines also had scales in his apartment and aided Fudge in bagging their cocaine base. From August 2000 to January 2001, Raines went to Chicago and returned with nine ounces of cocaine approximately twice a month.

Based on the damaging information retrieved through the wiretap and evidence obtained from a myriad of additional sources, a federal grand jury returned a 35-count indictment against eleven individuals.[1] The indictment charged each defendant with conspiracy to possess with the intent to distribute and conspiracy to distribute cocaine base from January 1999 to January 2001. The other counts charged various defendants with distributing co-

---

[1] The indictment also charged Kenneth Baker, Mitchell Davis, Paul Winfield, Graylin Cox, Sterling Daniels, Damien Cobbins and Tyrone Rogers. Their cases are not at issue in this appeal.

caine base and with possessing cocaine base with intent to distribute.

On June 18, 2001, Aja Fudge pleaded guilty to distributing five grams or more of cocaine base on January 12, 2001. The district court found her relevant conduct exceeded 1.5 kilograms and sentenced her to 151 months in prison.

Lamont Gordon, pursuant to a written plea agreement, pleaded guilty to conspiracy to distribute and conspiracy to possess with intent to distribute 50 grams or more of cocaine base. The district court determined that Gordon had personally distributed over a kilogram of crack cocaine and that he was well aware of the distribution by his fellow co-conspirators. The court sentenced him to 210 months in prison.

McChristian pleaded guilty to conspiracy to distribute and conspiracy to possess with the intent to distribute more than 50 grams of cocaine base. The court sentenced McChristian to 184 months in prison.

The final appellant, Rodney Raines, was not as cooperative as his partners. A warrant was issued following Raines' indictment on February 1, 2001. He was arrested and eventually arraigned in the Western District of Wisconsin on August 1, 2001. Raines was ordered detained pending trial. On August 10, 2001, Raines escaped from the Dane County Jail. Authorities apprehended him ten days later and subsequently indicted him for his escape. On January 2, 2002, Raines pleaded guilty to conspiracy to distribute and conspiracy to possess with the intent to distribute more than 50 grams of cocaine base and to one count in the escape indictment. On April 11, 2002, the district court sentenced Raines on both the drug charge and the escape charge. The district court found that Raines' conduct involved more than 1.5 kilograms of cocaine base; two levels were added for his possession of a firearm

during the course of the offense. The district court declined to grant Raines a reduction for acceptance of responsibility because he obstructed the prosecution of the case. The court sentenced Raines to life in prison on the drug charge and to a five-year concurrent sentence on the escape charge.

## ANALYSIS

The first argument we address has been raised by all the appellants except Lamont Gordon. They contend that the district court erred because it declined to grant a downward departure in their sentences based on disparities between sentences imposed in the Western District of Wisconsin and those imposed nationwide. Raines, however, faces a hurdle unique to his case: waiver. Fudge and McChristian requested disparity departures at their respective sentencing hearings. These sentencing hearings occurred before Raines' hearing. At Raines' sentencing hearing, counsel made objections limited to matters in the presentence report, but never sought departure on the basis of sentencing disparities. Waiver occurs when a defendant or his attorney manifests an intention or expressly declines to assert a right. *United States v. Cooper*, 243 F.3d 411, 416 (7th Cir. 2001). Waiver extinguishes the error and precludes appellate review. *United States v. Staples*, 202 F.3d 992, 995 (7th Cir. 2000). We have noted that failing to raise an issue before the district court results in a waiver of that issue on appeal. *United States v. Shorty*, 159 F.3d 312, 313 (7th Cir. 1998). Raines never made a claim for departure based on disparities in sentencing and thus waived his sentence disparity argument.

We now turn to the merits of the remaining appellants' argument concerning the sentencing disparity departure. Using data from the United States Sentencing Commis-

sion, the appellants show the average length of imprisonment for drug trafficking offenses in the Western District of Wisconsin is approximately 70% greater than the national mean length of imprisonment for drug trafficking offenses.[2]

We refrain from a prolonged analysis of these figures simply because we cannot review this issue. We lack jurisdiction to review a district court's discretionary refusal to depart downward unless the sentence was imposed in violation of the law or due to an incorrect application of the guidelines. *United States v. Brumley*, 217 F.3d 905, 913 (7th Cir. 2000). Perhaps realizing this problem, the appellants contend that the district court refused a downward departure because it believed that it could not depart as opposed to merely declining to do so. This claim is belied by the record. As McChristian notes, the judge did not simply dismiss the studies presented by the appellants; she reviewed the numbers and offered criticisms. She also recognized that the small size of the Western District of Wisconsin skewed the results. The district court never once indicated or even insinuated that she believed she could not depart on the basis of sentencing disparities. Moreover, the court faced this question on two separate occasions, at Fudge's sentencing hearing and later at McChristian's sentencing hearing. At the McChristian hearing, Judge Crabb specifically noted "I am also not inclined to give you a downward departure . . . based on the statistics of this district and other districts."

McChristian's appeal was limited to this issue; we now address each of the remaining appellants' claims individually.

---

[2] The statistical compilations were presented to the district court and cover 1997 through 1999.

### A.  *Aja Fudge*

#### 1.  Title III Requirements

Appellant Aja Fudge believes that the evidence obtained from the wiretap should have been suppressed because the application for the wiretap failed to comply with Title III requirements and the showing of necessity pursuant to 18 U.S.C. § 2518(1)(c). In addition, she claims the authorization of the wiretap did not conform to Title III requirements. Fudge's challenges to the Title III interceptions present questions of both law and fact. We review questions of law *de novo* and findings of fact for clear error.

Fudge first claims that the application for the wire tap failed to comply with 18 U.S.C. § 2518(1) and (1)(a) because it failed to identify on oath or affirmation the officer authorizing the wiretap. 18 U.S.C. § 2518(1) and (1)(a) state:

> Each application for an order authorizing or approving the interception of a wire, oral or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:
>
>> The identity of the investigative or law enforcement officer making the application, and the officer authorizing the application.

18 U.S.C. § 2518(1) and (1)(a).

As previously noted, the application asserted:

> Pursuant to an application authorized by a duly designated official of the Criminal Division, United States Department of Justice, pursuant to the power delegated to that official by special designation of the Attorney General and vested in the Attorney General by sec.

2516 of Title 18, United States Code, to intercept wire communications.

In addition, the government included two letters specifying the approval and authorization of an application and an affidavit from the FBI's lead agent in the investigation.

The government's piecemeal approach resulted in an application which tested the boundaries of complying with statutory provisions. Without demeaning the importance of technical violations, we note that the Supreme Court has said that "[not] every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *United States v. Chavez*, 416 U.S. 562, 574-75 (1974).

Fudge refrains from viewing the whole picture and instead insists on looking at each document in isolation. While the government was not a model of clarity as to the identity of the authorizing official, we, like the district court, are left with little doubt the authorizing official was Kevin DiGregory. DiGregory, Deputy Assistant General for the Criminal Division, is a person who Attorney General Reno bestowed upon the power to authorize wiretap applications.

The district court surmised that Assistant United States Attorney Jeffery Anderson prepared his application to the court before knowing which Department of Justice official would sign the authorization letter. It further posited that Anderson, instead of retyping a new draft, likely chose simply to incorporate the authorization letter by attaching it to the application. We agree with the district court's conclusion. There was no chicanery or deception involved in this application process.

We next consider Fudge's claim that the order authorizing the interception was improper. Like the wiretap application, she challenges the absence of any indication of

the person who authorized the application, in violation of 18 U.S.C. § 2518(4) and (4)(d). These sections provide:

> Each order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter shall specify:

> The identity of the agency authorized to intercept the communications, and of the person authorizing the application.

18 U.S.C. § 2518(4) and (4)(d).

The order authorizing the interception of wire communications did not specify by name the person who authorized the application. It did, however, state that the application was authorized "by a duly designated official of the Criminal Division, United States Department of Justice, pursuant to the power delegated to that official by special designation of the Attorney General and vested in the Attorney General." At oral argument, the government admitted that the order failed to identify who authorized the application, but justified the absence by explaining the district court left it out by mistake. We find better solace in *Chavez v. United States*, 416 U.S. 562 (1974), where the Supreme Court considered errors in the context of 18 U.S.C. § 2518(4)(d). It noted, "[w]here it is established that responsibility for approval of the application is fixed in the Attorney General, however, compliance with the screening requirements of Title III is assured, and there is no justification for suppression." *Id.* at 572. In the case *sub judice*, the order specifically noted authorization was made pursuant to a power delegated by the Attorney General. Thus, we believe that under *Chavez*, the order's failure to identify the individual who authorized the application did not violate any substantive requirement of Title III and consequently does not warrant suppression.

Fudge has one final basis for challenging the wiretap. She argues the application for the wiretap failed to make the

required showing of necessity pursuant to 18 U.S.C. § 2518 (1)(c). This section requires the government, in its application for an interception order, to provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). These requirements are set forth in the alternative and thus the government need only establish one of the three. *United States v. Adams*, 125 F.3d 586, 595 (7th Cir. 1997). Wiretaps do not have to be used only as a last resort in an investigation. *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991). The evil we are trying to avoid is the routine use of wiretaps as an initial step in the investigation. *Id.* However, the government's burden of proving necessity is not extraordinarily high, and our review is not hyper-technical. *United States v. Dumes*, 313 F.3d 372, 378 (7th Cir. 2002); *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir. 1976).

Fudge's first argument essentially contends that evidence of a specific individual engaging in a criminal activity obviates the need for any additional, more probing, investigative techniques. Unsurprisingly, she cites no case law supporting this proposition. The government used the wiretap for a number of reasons, not the least of which was to obtain more incriminating evidence. We do not find such a basis problematic.

Fudge next claims the wiretap was unnecessary because enough information existed to prosecute each conspirator individually. This argument ignores the fact that this was an intricate investigation involving a large and dangerous drug conspiracy. The government had exhausted most, if not all, of the major methods for obtaining information. The wiretap enabled them to avoid the logistical quandaries that would arise if it had taken the litigation approach Fudge suggests. Moreover, the ability to success-

fully prosecute all the conspirators would be greatly compromised. This situation is akin to that of *United States v. Adams*, 125 F.3d 586 (7th Cir. 1997). In *Adams*, we upheld the grant of a wiretap because other methods of investigation would be unsuccessful in identifying the drug suppliers and in discerning the full scope of the organization. *Id.* at 595-96. As in *Adams*, the government's use of the wiretap on the P-Stone Nation effectively supplemented the other sources of evidence and permitted them to view the big picture, from the top of the organization to the lowest rung. The wiretap was instrumental in filling the gaps and securing critical evidence against the conspirators; we decline to impose implacable burdens that would frustrate this result.

Fudge cites language from other circuits that appears favorable to her position. We do not question the logic of these decisions, rather, they are simply inapplicable to her case. The underlying facts are clear. The wiretap was not the first step of this investigation. Actually, the government made various attempts to obtain evidence from many sources. Fudge's importance to the scheme and her fungible duties necessitated a wiretap on these phones. Finally, the wiretap was not just an "additional tool" in the investigative process. Actually, it was the method that enabled them to gauge the depth and scope of this conspiracy.

Shawn Johnson's 46-page affidavit was submitted with the application for an order authorizing a wiretap. It detailed the need for the interception of wire communications. It set forth the alternative investigative procedures and their lack of success. The affidavit clearly establishes that the government met the statutory criteria set forth in 18 U.S.C. § 2518(1)(c). The district court's grant of the wiretap and admission of the evidence obtained through it was not an abuse of discretion.

2. Relevant Conduct

Fudge next argues that the district court erred when it found her relevant drug conduct was more than 1.5 kilograms of crack cocaine. We review the district court's factual findings regarding the quantity of drugs attributable to a defendant for clear error and we affirm unless we have a definite and firm conviction that a mistake has been made.

Fudge contends that the court did not make a detailed finding as to how it arrived at a figure of more than 1.5 kilograms. Fudge also argues that the district court improperly deemed transactions by other co-defendants to be foreseeable to Fudge and therefore attributable to her. To support these arguments, Fudge cites *United States v. McEntire*, 153 F.3d 424 (7th Cir. 1998). In *McEntire*, we held that a court must make an explicit finding as to the drug quantity and offense level and how it arrived at the sentence. *Id.* at 435. We also noted that a sentencing court should state the reasons why each individual defendant was aware of or reasonably foresaw the particular amount of drugs attributed to her. *Id.*

The case against Fudge is rife with strong, direct and uncontradicted evidence from a myriad of reliable sources. Contrary to Fudge's contentions, this case is distinguishable from *United States v. Palmer*, 248 F.3d 569 (7th Cir. 2001). In *Palmer*, we vacated the defendant's sentence because he pleaded guilty to a small amount (4.7 grams) of crack cocaine, yet was held accountable for more than 150 grams. Unlike *Palmer*, Fudge admitted she was involved with a substantial amount (1,395.47 grams) of crack cocaine. Moreover, the district court adopted the findings of the Presentence Investigation Report ("PSR") which painstakingly set forth the amount of drugs involved in the conspiracy as a whole, and the quantities attributed to the individual defendants. As the PSR pro-

vided, and the district court adopted, three witnesses described cocaine transactions with Fudge in addition to four co-defendants who described continuous dealings with her. At the sentencing hearing, the district court noted that the strength of the evidence against Fudge was overwhelming and that she served as Raines' "alter ego" and "assistant." The court later noted that the evidence showed "she was a very key player in this conspiracy and that she was very, very active in it." The court summed up its conclusions, finding that Fudge conspired to distribute more than 30 kilograms of cocaine base, an estimate "derived from witness and co-defendant statements, cocaine base seized or controlled buys and arrests and wiretap transfers."

In our opinion, the district court fully complied with the letter and spirit of both this Court's precedent and the Sentencing Guidelines. The court made explicit findings as to the drug quantity and offense level and explained how she arrived at the sentence. Furthermore, the court emphasized the key role Fudge played in the conspiracy and consequentially, why she was being held accountable for more than 1.5 kilograms. The district court did not err in its sentencing determination.

### B. Lamont Gordon

Gordon, like Fudge, also challenges the district court's conclusion that his relevant drug conduct included more than 1.5 kilograms of cocaine base. He argues that the district court erred because it failed to establish that the drug quantity was foreseeable to Gordon. As noted above, we review for clear error.

Gordon asserts that the sentencing hearing was suspect because there were no witnesses presented and the court relied heavily on the findings presented in the PSR. This contention ignores our prior rulings. We have held

that a district court may rely upon any information, "including a PSR or trial notes, so long as that information bears sufficient indicia of reliability to support its probable accuracy." (internal quotes omitted). *United States v. Hickok*, 77 F.3d 992, 1009 (7th Cir. 1996). Gordon does not question the reliability of the PSR; rather, he challenges the use of the PSR. Our precedent is clear; a district court's reliance on the PSR is entirely legitimate, and thus, Gordon's argument fails.

Gordon's also claims that the 30 kilograms of cocaine attributed to the conspiracy were not foreseeable as to him. In determining whether the drug quantities were reasonably foreseeable to the defendant, we examine the scope of the defendant's agreement with the other conspirators. *United States v. Edwards*, 945 F.2d 1387, 1392 (7th Cir. 1991). Gordon cites Application Note 6 of the Sentencing Guidelines, § 1B1.3 as support for his position. Application Note 6 states in pertinent part:

> Defendant P is a street-level drug dealer who knows of other street-level drug dealers in a geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a joint undertaking of criminal activity with him.

Application Note 6, § 1B1.3.

Gordon attempts to analogize his situation to this hypothetical. His analogy is misplaced. Gordon did not act independently of the P-Stones as he contends; rather, he acted interdependently. This fact, bolstered by direct, uncontradicted evidence supports a finding that Gordon was involved in a joint criminal undertaking. The evidence shows that he interacted with other co-conspirators

on a weekly basis and arranged meetings and drug deals with other co-conspirators. Gordon acted as a backup, a reserve who would be called in to relieve the main players when they got tired or were unavailable. He answered phone calls for co-defendant Mitchell Davis and aided him in drug deals. This is not mere knowledge of other individuals selling drugs; this is prime involvement.

Gordon also highlights his peripheral status in relation to the overall investigation. Gordon was not on any surveillance videos, was heard on the wiretap only twice, and was never mentioned in the 46-page affidavit in support of an application for a wiretap. But Gordon disregards his own damaging admissions. He admitted that he sold approximately one-quarter ounce of crack cocaine every two to three days, that he sold crack cocaine in Madison for two years, and that he covered for other P-Stone members. Moreover, Gordon's status as a backup dealer does not diminish his importance in the overarching conspiracy and does not hide the substantial amounts of drugs he peddled.

Gordon made detailed statements regarding his knowledge of the dealings of his co-conspirators which were encapsulated in the PSR and adopted by the district court. These statements amply support the district court's conclusion that the 30 kilograms of cocaine were reasonably foreseeable to Gordon. For these reasons, the court's decision concerning Gordon's relevant conduct was not clearly erroneous.

### C.  Rodney Raines

Raines makes a number of challenges concerning his sentence; we address each in turn.

1.  Burden of Proof

Raines first contends that the district court improperly enhanced his sentence based on his possession of a firearm. The Sentencing Guidelines provides for a two-level increase in the offense level "if a dangerous weapon was possessed." U.S.S.G. § 2D1.1(b)(1). This adjustment should be applied "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1), Application Note 3. Whether something is clearly improbable is a question of fact we review for clear error. *United States v. Vargas*, 116 F.3d 195, 197 (7th Cir. 1997).

Raines argues that the court improperly shifted the burden of having to establish that the firearm was not part of the conspiracy. His claim ignores the long line of cases that have addressed this issue. *See, e.g.*, *United States v. Bjorkman*, 270 F.3d 482, 492 (7th Cir. 2001); *United States v. Booker*, 248 F.3d 683, 689 (7th Cir. 2001); *United States v. Tyler*, 125 F.3d 1119, 1122 (7th Cir. 1997). The government bears the initial burden of showing the defendant possessed a weapon in a place where drugs were present. *Bjorkman*, 270 F.3d at 492. Once the government meets its burden, the burden shifts to the defendant, who must then demonstrate that it is "clearly improbable" the gun was connected with the drug offense. *United States v. Johnson*, 289 F.3d 1034, 1042 (7th Cir. 2002). This is precisely what occurred in this case. The government established that Raines had a firearm in the room where he was arrested after escaping from prison. At that point, the government satisfied its burden and the burden shifted to Raines to demonstrate the weapon was not connected with the drug offense. He failed.

After entering the premises, authorities found Raines hiding in a basement bedroom with a loaded submachine gun which was not totally hidden and easily accessible to him. This qualifies as constructive possession.

Raines does not fully consider our interpretation of the enhancement under U.S.S.G. § 2D1.1(b)(1). We have held that this enhancement may be applied if the defendant possessed the firearm during the offense that led to the conviction or during relevant conduct. *United States v. Johnson*, 227 F.3d 807, 814 (7th Cir. 2000); *United States v. Berkey*, 161 F.3d 1099, 1102 (7th Cir. 1998). Relevant conduct includes all acts in the course of attempting to avoid responsibility for that offense. U.S.S.G. § 1B1.3(a)(1). Raines' escape was part of the relevant conduct; it was an attempt to avoid responsibility for the underlying drug offense. Thus, the district court properly applied the sentencing guidelines and correctly followed the burden shifting provisions.

Raines also appears to assert that the district court incorrectly added a two-level enhancement based on his escape which was not part of the conspiracy. For the reasons just noted, his argument fails. Relevant conduct includes all acts in the course of attempting to avoid responsibility for that offense. U.S.S.G. § 1B1.3(a)(1). Raines' escape was part of the relevant conduct; it was an attempt to avoid responsibility for the underlying drug offense.

2.  Relevant Conduct

Raines contends that the district court erred in attributing more than 1.5 kilograms of cocaine base to him in determining his relevant conduct. We review the district court's factual findings regarding the quantity of drugs attributable to a defendant for clear error. *United States v. Palmer*, 248 F.3d 569, 570-71 (7th Cir. 2001).

Raines argues that the court enhanced the sentence based on the mistaken notion that he was the "ring leader." The court, however, never used this phrase, instead simply referring to Raines as "a high-level distributor [who]

provided a steady supply of cocaine base. . . ." Given the magnitude of the evidence, this conclusion is correct. Co-defendants Gordon, Winfield, Davis, Baker and Daniels all provided detailed information about Raines' involvement in the conspiracy. Gordon obtained one-quarter ounce of cocaine base once a week for two years from Raines. Winfield obtained approximately one ounce of cocaine base from Raines fifteen to twenty times during 2000. Davis obtained two and a half ounces of cocaine base from Raines. Finally, Raines sold cocaine base to Baker from the summer of 2000 through January 2001 and sold one-quarter ounce of crack cocaine to Daniels biweekly for two years. The numbers do not lie. The mountain of evidence pointing toward Raines confirms that the district court's relevant conduct determination was correct.

3. Acceptance of Responsibility

Raines next argues that the district court erred when it declined to grant him a two-level reduction for acceptance of responsibility. The United States Sentencing Guidelines provide that "if the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a). We review a district court's acceptance of responsibility determination for clear error. *United States v. Booker*, 248 F.3d 683, 690 (7th Cir. 2001). However, we defer to the district court because it is in a much better position to assess the defendant's statements and demeanor. *Id.*

Raines merely asserts that the court committed error, offering scant explanation. He does offer some skeletal reasoning, namely that his good faith plea entitles him to a reduction for acceptance of responsibility. Although this provision is designed in part to save the government the expense of going to trial, a timely guilty plea alone

does not entitle a defendant to a reduction for acceptance of responsibility. U.S.S.G. § 3E 1.1, Application Note 3; *United States v. Bosque*, 312 F.3d 313, 316 (7th Cir. 2002). More important, a defendant who obstructs justice is presumed not to have accepted responsibility. *See*, *e.g.*, U.S.S.G. § 3E1.1, Application Note 4; *United States v. Travis*, 294 F.3d 837, 840 (7th Cir. 2002). Because Raines obstructed justice, he must demonstrate that his case is "extraordinary" so as to justify a downward adjustment for acceptance of responsibility. U.S.S.G. § 3E1.1, Application Note 4. Raines makes no effort to demonstrate why his case is extraordinary; likely because there is no basis to do so. After the indictment, Raines remained a fugitive, warning co-defendant Fudge that all the evidence in their apartment had to be destroyed. After authorities apprehended him, he escaped from jail and was later caught in a room with a loaded TEC 9, submachine gun. Raines admitted to authorities that he was waiting to receive new identification and was planning to leave the area shortly thereafter. Raines decided to accept responsibility only as a last recourse. For these reasons, the district court's decision denying Raines a two-level reduction for acceptance of responsibility was not erroneous.

### 4. Ineffective Assistance of Counsel

Finally, Raines claims that he received ineffective assistance of counsel during his plea hearing. Whether Raines received ineffective assistance of counsel is a mixed question of law and fact reviewed *de novo,* with a strong presumption that his attorney performed effectively. *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1333 (7th Cir. 1990). We review an ineffective assistance of counsel claim under the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The Supreme Court has held that the *Strickland* analysis applies to

counsel's conduct during the pleading phase. *Hill v. Lockhart*, 474 U.S. 52*,* 57-58 (1985). For Raines to be successful, he must first show his attorney performed in a deficient manner, *Strickland*, 466 U.S. at 687, and then prove that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

If we find that counsel's alleged deficiency did not prejudice the defendant, we need not consider the first prong of the *Strickland* test. *Matheney v. Anderson*, 253 F.3d 1025, 1042 (7th Cir. 2001). We follow this course since Raines has failed to prove he suffered prejudice as a result of his counsel's performance. More precisely, Raines has not offered a shred of evidence that supports his claim. As we have noted, a "mere allegation by the defendant that he would have insisted on going to trial is insufficient to establish prejudice." *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) (quoting *United States v. Arvanitis*, 902 F.2d 489, 494 (7th Cir. 1990)). Raines offers no evidence, other than his averment that but for trial counsel's advice, he would have gone to trial. Such an emaciated argument is unpersuasive. A defendant is required to establish through objective evidence that a reasonable probability exists that he would have gone to trial. *McCleese v. United States*, 75 F.3d 1174, 1179 (7th Cir. 1996). Moreover, the defendant's sole assertion that he would have proceeded to trial cannot carry the burden to show prejudice under *Strickland. See*, *e.g.*, *Arango-Alvarez v. United States*, 134 F.3d 888, 893 (7th Cir. 1998); *United States v. Arvanitis*, 902 F.2d 489, 495 (7th Cir. 1990); *Gargano v. United States*, 852 F.2d 886, 891 (7th Cir. 1988). The law on this issue is clear and straightforward and because Raines has failed to meet his burden, we reject his ineffective assistance claim.

## CONCLUSION

For the foregoing reasons, we AFFIRM the sentences of each appellant.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*