UNITED STATES of America,

v.

Kenneth SHEARER.

No. 1:01–CR–49.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Oct. 17, 2003.

Mark D. Stuaan, Barnes & Thornburg, Indianapolis, IN, Robert E. Love, Love and James, Fort Wayne, IN, for Kenneth Shearer.

Barbara T. Wells, Office of Consumer Litigation, U.S. Department of Justice, Washington, DC, David H. Miller, U.S. Attorney's Office, Fort Wayne, IN, for United States of America.

### SENTENCING MEMORANDUM

WILLIAM C. LEE, Chief Judge.

Presently before the court are Defendant, Kenneth Shearer's ("Defendant" or "Shearer's") Objections to the Presentence Investigation Report ("PSR"). On April 10, 2003, this court heard evidence on the objections and ordered briefing on each objection. Defendant filed his initial brief on June 23, 2003 to which the Government responded on July 22, 2003. Defendant replied on August 6, 2003. For the following reasons, Defendant's objections to the PSR will be DENIED. Defendant's request for a downward departure will be GRANTED.

### BACKGROUND

On July 25, 2001, Defendant was charged by way of a four count indictment alleging violations of 18 U.S.C. §§ 842(a)(1), 844(a)(1), and 2, dealing in explosive materials without a license (Count 1); violations of 49 U.S.C. §§ 5104(b), 5124, and 18 U.S.C. § 2, tampering with marking, label or placard required on hazardous material (Count 2); and violations of 18 U.S.C. §§ 842(a)(3)(A), 844(a)(1), and 2, receiving explosive materials in interstate commerce (Counts 3 and

4). On June 16, 2002, a jury trial commenced and, on June 20, 2002, a jury found the Defendant guilty as charged on all counts in the indictment. Thereafter, the United States Probation Office prepared a PSR wherein the probation officer calculated defendant's total offense level of 37, his criminal history category at III, leaving the defendant with a sentencing range of 262 to 327 months. In reaching this conclusion, the probation officer determined that a base offense level of 24 applied pursuant to U.S.S.G. § 2K1.3. To this base offense level, the probation officer further determined that the following increases were warranted:

— a five level increase to the base offense level under U.S.S.G. § 2K1.3(b)(1)(E) because the offense involved more than 1,000 pounds of explosive materials

— a four level increase pursuant to U.S.S.G. § 3B1.1(a) because the defendant was the organizer or leader of five or more participants or the criminal activity was "otherwise extensive;"

— a two level increase pursuant to U.S.S.G. § 3B1.4 because the defendant employed minors to commit the offense; and

— a two level increase pursuant to U.S.S.G. § 3C1.1 because the defendant obstructed justice

Defendant objects to the initial base offense level determination as well as to each of the increases to that initial base offense level. In addition, defendant challenges the probation officer's failure to include a reduction to the base offense level for acceptance of responsibility. With respect to the initial base offense level determination, the defendant also seeks a 5K2.0 downward departure. After a general overview of the record,[1] the court shall address each of these arguments in turn.

Defendant owned and operated a retail consumer fireworks store, All American Professional Fireworks. PSR, ¶ 6. Evidence received at trial established that this business was utilized as a cover for the illegal business of receiving and selling display fireworks[2] without a license issued by the ATF. *Id.* As part of this course of conduct, Defendant also placed false "1.4G" hazard class labels on approximately 400 cases of display fireworks so as to make them appear to be consumer class fireworks. *Id.*

To facilitate his criminal enterprise, Defendant recruited at least nine (9) individuals to assist him. Trial testimony established that All American Professional employees, Al Johnson ("Johnson"), Jeff Williams ("Williams"), William Waxel ("Waxel"), William Ballenger ("Ballenger"), Tyler Baughman ("Baughman"), and Matthew Shearer ("M. Shearer") knowingly placed false 1.4G hazard class labels on the display fireworks to conceal their true nature. At the time of the offense, Waxel and M. Shearer were minors.

1. Specific references to the record will be included where necessary during the "Discussion" portion of the opinion.

2. As discussed at trial, display fireworks are explosive materials whose purchase, storage, sale, and transportation are strictly regulated by ATF and the United States Department of Transportation "USDOT." As part of the regulation of display fireworks, dealers of such fireworks must have a license issued by the ATF, storage of the display fireworks must be in ATF approved explosive magazines located away from public highways and inhabited buildings. Likewise, the acquisition, disposition and inventory records for such fireworks are regularly reviewed by ATF inspectors and must be retained for a period of years. Display fireworks must also bear a 1.3G" USDOT hazard label to indicate that they contain explosives which present a mass detonation hazard.

Defendant also recruited Robert Bombka ("Bombka"), an ATF permittee, to be a straw purchaser of display fireworks from Wolverine Fireworks in Michigan. Shearer used Bombka's permit and name for purchases from Island Fireworks in Wisconsin. Shearer and Bombka structured the payment of the Island Fireworks bill by exchanging checks for the same amount made payable to Island Fireworks. At trial, Bombka testified that he knew his conduct was "wrong." PSI, ¶ 13.

Shearer also used his brother, Nelson Shearer ("Nelson"), to pose as an employee of Bombka's at Island Fireworks. Nelson picked up two purchases from Island Fireworks, one on June 13, 1999 and the other on June 27, 1999. During each pickup, Nelson certified on the ATF explosives delivery form that he was Bombka's employee. However, at trial, Nelson testified that he had never spoken to Bombka, PSI, ¶ 14 and Bombka testified that he had never employed Nelson.

Shearer utilized Ed Stearns to obtain rental space at Ron's U–Store to conceal the display fireworks. Shearer retained sole control of the rental space but Stearns was the named lessor on the rental contract. Stearns paid the monthly rental fee with his personal funds but was reimbursed for these expenses by Shearer in cash. PSI, ¶ 15.

At trial Shearer testified on his own behalf. Shearer denied that he purchased display fireworks from Island Fireworks; denied that he sold display fireworks to anyone, including an individual named Pauline St. Marie in 1999 or 2000; testified that any display fireworks found at his business from Wolverine Fireworks were for personal use not resale; and testified that he believed he was operating with a valid license during the relevant time peri-od. Shearer further testified that Bombka had a license to deal in explosives when, in fact, he knew that Bombka had only a permit not a license.

## DISCUSSION

### A. Defendant's Objections to the Initial Base Offense Level Calculation under U.S.S.G. § 2K1.3 and Request for a Downward Departure

Shearer objects to the probation officer's determination that his base offense level is 24, a calculation which is based almost exclusively on his criminal history. Shearer's argument on this point is two-fold. First, Shearer maintains that only one of his two prior felony convictions should count against him for purposes of determining his base offense level under § 2K1.3. Alternatively, Shearer notes that his case presents an unusual circumstance which would warrant a downward departure to a base offense level of 12. The court shall address each argument in turn.

It is undisputed that Shearer has two convictions (hereinafter, separately identified as "the 1983 Offense" and "the 1984 Offense") for state drug trafficking offenses. As it relates to the 1983 Offense, Shearer was sentenced to two to five years, all of which was suspended and a 3 year term of probation. Subsequently, in September 1984, and after committing the 1984 Offense, Shearer's probation was revoked and he was ordered to serve two to five years consecutive[3] to the sentence for the 1984 Offense. Shearer was paroled on both sentences in April 1987 and his discharge date was April 1989.

Pursuant to U.S.S.G. § 2K1.3(a)(1), a base offense level of 24 is appropriate "if the defendant committed any part of the

---

3. At the evidentiary hearing there was substantial discussion as to whether the sentences for his two drug offenses ran concur-rently or consecutively. In the end, the Government stipulated that the offenses ran consecutively. (Hearing Transcript, p. 15).

instant offense subsequent to sustaining two felony convictions of either a crime of violence or a controlled substance offense." In determining whether a defendant has two prior felony convictions for a crime of violence or a controlled substance offense, the court is guided by the meaning given such terms in U.S.S.G. § 4B1.2. Application Note 2 to U.S.S.G. § 2K1.3. Likewise, Application Note 9 to U.S.S.G. § 2K1.3 states that only those felony convictions that receive criminal history points under U.S.S.G. § 4A1.1(a), (b), or (c) count for purposes of applying the base offense level of 24 under § 2K1.3(a)(1).

There is no question (and no argument to the contrary by Shearer) that his two prior felony convictions qualify as either a crime of violence or a controlled substance offense under § 4B1.2. Rather, Shearer's contention is that he cannot receive criminal history points for at least one of his two prior convictions because the sentence imposed and/or his period of incarceration falls outside the time period prescribed under § 4A1.2(e). That section provides:

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment that exceeded one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

U.S.S.G. § 4A1.2(e)(1).

The crux of Shearer's argument is that because his sentences for both the 1983 Offense and the 1984 Offense were to run consecutively, he ceased imprisonment on the 1983 Offense outside of the fifteen (15) year period. To support this argument, Shearer offers no evidence indicating when he ceased serving time on his 1983 Offense and began serving his term of imprisonment on the 1984 Offense. Even with such evidence, however, the record on its face simply does not support this argument.

The instant offense conduct occurred in the summer months of 1999. This said, the 1983 Offense would be on the cusp of the fifteen year period and thus, might not, as counsel suggests, warrant counting for purposes of either § 4A1.2 or § 2K1.3.[4] However, what Shearer fails to account for is the fact that his probation on the 1983 Offense was revoked and his imprisonment sentence reinstated in September 1984. This said, he clearly was incarcerated in September 1984 (and beyond) on the 1983 Offense thereby placing his period of incarceration within the 15 year time period. Accordingly, Shearer's argument that he does not have two prior felony convictions for purposes of applying § 2K1.3 and assessing him a base offense level of 24 is without merit.

■ Having resolved this issue, Shearer argues alternatively that his cases presents an unusual fact which warrants a 5K2.0 departure from the guidelines so as to bring his base offense level downward from a level 24 to a level 12. The unusual circumstance, which the Government acknowledges is present here, is that Shearer, while a two-time felon, was granted "relief from disability" by the ATF, thereby making him a non-prohibited person under the law who is permitted to become

---

4. Indeed, it would appear that this conviction would not count since the original sentence of 2 to 5 years imprisonment was suspended and a three year probationary period assessed. While the three year probationary period is considered a "prior sentence," see Application Note 2 to U.S.S.G. § 4A1.2 ("A sentence of probation is to be treated as a sentence..."), this sentence would only warrant counting under § 4A1.1(c) if it fell within ten years of the instant offense conduct. See Application Note 3 to U.S.S.G. § 4A1.1(c) ("A sentence imposed more than ten years prior to the defendant's commencement of the instant offense is not counted.").

a licensed fireworks dealer.[5] *See* 18 U.S.C. § 845(b)(1) (permitting a person who is prohibited from shipping, transporting, receiving, or possessing any explosive to apply to the Secretary for relief from such prohibition); and (b)(2) (authorizing the Secretary to grant relief if the Secretary determines "that the circumstances regarding the applicability of section 842(i), and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of such relief is not contrary to the public interest."). For this reason, Shearer contends that he should be relieved from the effect of § 2K1.3(a)(1) which places his base offense level at 24 because of his two prior convictions, in favor of the more lenient provisions of § 2K1.3(a)(4) which provide a base offense level of 12 for those persons who do not "otherwise" fit into the more culpable categories of § 2K1.3.[6]

In its response, the Government indicates that while it believes Shearer does technically fit within the category of persons to which § 2K1.3(a)(1) applies, it does not object to a downward departure indicating that "[the defendant's] unusual status of having received relief from disability from ATF makes the fit [in § 2K1.3(a)(1) ]uncomfortable for the government." The Government then indicates

that the court may wish "to consider whether a departure pursuant to 5K2.0 is appropriate on the ground that this defendant's base offense level of 24 (as opposed to a level 16 for a 'prohibited person' or a level 12 for a non-felon) may overstate his legal status under federal explosives laws." Given the Government's concession that a departure pursuant to § 5K2.0 may be warranted, the court shall turn now to the applicable law relating to such a departure.

Under § 5K2.0, a sentencing court may depart from the applicable guideline range if it finds an aggravating or mitigating circumstance not adequately taken into consideration by the guidelines. *See* 18 U.S.C. § 3553(b); *United States v. Dote,* 328 F.3d 919, 925 (7th Cir.2003). "Other than prohibited factors, such as race, sex, and national origin, the guidelines place essentially no limit on the potential factors that may warrant a departure." *United States v. Miller,* 343 F.3d 888 (7th Cir. 2003).

In this case, it is clear that the guidelines do not consider the factor that Shearer contends warrants a departure in his case. The ATF granted Shearer relief from disability so as to enable him to be a licensed dealer in explosives and therefore, relieved him from the taint of his two prior convictions for this purpose.[7] This "relief from disability" does not, as the Govern-

---

**5.** Shearer did, in fact, hold a license which expired at some point prior to the offense conduct. At trial, Shearer argued that he filed an application for renewal with the ATF and, after receiving no response, he believed his license had been renewed. The Government, however, had no record of receiving any application for renewal from Shearer.

**6.** These other categories contained in § 2K1.3 are: § 2K1.3(a)(2)a base offense level of 20 if the defendant had one felony offense at the time of the instant offense; § 2K1.3(a)(3)—a base offense level of 16 if the defendant was a prohibited person or knowingly distributed explosives to a prohibited person;

§ 2K1.3(a)(4)—a base offense level of 12 "otherwise."

**7.** The Government has not argued that the provisions of § 2K1.3(a)(2) are appropriate and the court does not find it applicable. This section calculates the initial base offense level at 20 if a defendant has a single prior felony conviction. Similar to the court's conclusion that the ATF's grant of "relief from disability" warrants a downward departure from § 2K1.3(a)(1) (base offense level of 24 for two prior felony convictions), the court also concludes that § 2K1.3(a)(2) would not be appropriate.

ment notes, wipe the slate entirely clean with respect to his prior convictions. Indeed, those prior convictions are counted against Shearer in determining his criminal history category and thus, they have played a role in the calculation of his sentence. However, the fact that the ATF relieved Shearer from his prior convictions for purposes of obtaining a fireworks license does place him more neatly (as the Government concedes) into one of the categories of lesser culpability set forth in U.S.S.G. § 2K1.3. Indeed, in this court's view, the Defendant's conduct falls within the parameters of § 2K1.3(a)(4) so as to warrant an initial base offense level of 12. Defendant was not a prohibited person nor does the Government argue that he knowingly distributed explosive materials to a prohibited person so as to lead to the conclusion that § 2K1.3(a)(3) (base offense level of 16) would apply.

In sum, there is nothing in the guidelines which accounts for the unique circumstances present in this case or prohibits their consideration. This said, the court concludes that Shearer's status as having been granted relief from disability is a factor not adequately considered by the guidelines and places Shearer outside of the "heartland" of cases embodied by the guideline. Accordingly, the court shall GRANT Defendant's request for a downward departure and depart from an initial base offense level of 24 to an offense level of 12 under § 2K1.3(a)(4).

**B.** *Defendant's Objection to the Five Level Increase (§ 2K1.3(b)(1)(E)) for the Weight of the Explosives*

The probation officer assessed Shearer a five level increase to his base offense level pursuant to U.S.S.G. § 2K1.3(b)(1)(E) because the offense involved more than 1,000 pounds of "explosive materials". *See* U.S.S.G. § 2K1.3(b)(1)(E) ("If the offense

involved twenty-five pounds or more of explosive materials, increase as follows...1000 lbs. or more add 5"). Shearer first objects to any increase at all claiming that the fireworks do not constitute "explosive materials" under the Guidelines. Second, Shearer asserts that if the fireworks are classified as "explosive materials" he should only have been assessed a four level increase because the weight of the explosives was at least 500 but less than 1,000 pounds. U.S.S.G. § 2K1.3(b)(1)(D).

*Fireworks as "Explosive Materials"*

■ Turning first to Shearer's contention that the fireworks materials were not "explosive materials" as that term is defined by the Guidelines, the court finds this argument unavailing. The phrase "explosive materials" is defined in Application Note 1 to § 2K1.3 to include "explosives, blasting agents, and detonators." The term "explosives" is further defined in Application Note 1 by reference to the definitions in 18 U.S.C. § 844(j):

> [T]he term "explosive" means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuses (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive and incendiary devices...and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

What Shearer's argument boils down to is his contention that because Congress chose not to include the word "fireworks" in the definition of "explosives," the materials in this case do not fall within the scope of the Guidelines' definition.[8] In

---

8. Similar arguments have been made before

in the context of the statutory language itself

particular, Shearer argues that fireworks are "intended and used for celebrations and to commemorate significant historical events, such as the Fourth of July" while explosives "are intended, and used for destruction; not celebration." (Dfdt.'s Br. p. 3). Other than this explanation, Shearer provides no evidence that fireworks do not qualify under the definitions above nor does he set forth any case law that would support his position.

This lack of case authority to support his position is not surprising since both the trial and testimony at the sentencing hearing indicate that the fireworks at issue here contained fuses, powders and other detonating agents for the purpose of creating a device that deflagrates, i.e., an explosive device. *See generally* Testimony of Neal Gasser ("Gasser Test. at _____"), June 18, 2002 (discussing chemistry of display fireworks in this case including amounts and chemical composition of flash powder [9] and other pyrotechnic materials and concluding that the fireworks contained flash powder); Testimony of William Blasius ("Blasius Test. at _____"), June 19, 2002 at 129 (indicating display fireworks contain flash powder); Testimony of David Albritten ("Albritten Test. at _____"), June 18, 2002 at 97 (calling display fireworks "explosive devices").

Moreover, while Shearer argues that the intended use of the device (i.e., as a celebratory device vs. a device intended to destroy property) somehow factors into the equation, there is no such distinction

made in either the guidelines or the statutory references therein. Indeed, the question does not appear to be whether a device is intended for recreation or destruction. Rather, the issue is whether the device contains a specific chemical composition referenced in the various definitions that would cause the device to explode and, in turn, make the device a public safety hazard. Here, the evidence at trial was clear that display fireworks of the type purchased by Shearer are extremely volatile devices capable of mass destruction, aside from their intended use as fireworks. On this point, the Government offered the testimony of Dr. John Conkling at trial who discussed the potential dangers of display fireworks in as follows:

A: . . . If there were a fire, the normal expected reaction for a 1.3 [display firework] . . . would be a more violent fire ball, possibly an explosion. 1.4 products [consumer fireworks] in a fire situation, individual units will ignite and do their thing. . .

Q: When you say large fire ball with respect to display fireworks, are you talking about a mass detonation risk?

A: That would be the outer limit that would be expected. It could conceivably go to a large explosion, yes.

Q: Are you familiar with the recommendations for how big an area

and rejected. *See United States v. Spiezio*, 523 F.Supp. 264, 277 (E.D.Pa.1981). In that case, the defendants were charged and convicted of violations of 18 U.S.C. § 842 but urged, that because Congress failed to use the word "fireworks" in the statute under which they were charged, Congress did not intend to include fireworks. In rejecting this argument, the Court concluded, ". . . it was appropriate for Congress to describe explosive ma-

terials in terms of the materials themselves rather than to use the term fireworks." *Id.*

9. The Government proffered an expert, Dr. Conkling, at trial who testified that a key difference between consumer and display fireworks is the amount of flash powder contained in the device. Flash powder, according to Dr. Conkling, "is the chemical mixture which produces the bang, the loud noise in the firecracker."

should be cleared if there's an accident involving display fireworks?

A: Yes.

Q: And what's that recommended clearing?

A: If there's an incident involving 1.3 product in transportation, the recommended action is [to] evacuate the area immediately for a distance of half a mile.

Q: And what about the evacuation recommendation for an incident involving consumer fireworks?

A: Recommendation there is clear the immediate area, but you would not have to do a major evacuation.

Conkling Test. at 157–164; see also Blasius Test. at 130 (setting forth differences between consumer and display fireworks).

From this testimony, it is clear that display fireworks create a harm of mass detonation which endangers the public and thus, they certainly fall within the ambit of the types of devices intended to be regulated by the definition of "explosives" in the Guidelines. In fact, this intent is clear from the very heading of the subtitle to § 2K of the Guidelines which describes the section as "offenses involving public safety." Here, there can be no question that Shearer's conduct of unlawfully dealing in display fireworks endangered public safety and given the purpose of the Guideline provision to punish the unlawful possession/distribution of such devices, the court concludes that the display fireworks in this case constitute "explosives" under the Guidelines and thus are "explosive materials" for purposes of applying U.S.S.G. § 2K1.3.

### Weight of Explosive Materials

Having concluded that the display fireworks in this case fall within the definition of "explosive materials," the court must next address Shearer's contention that the probation officer incorrectly calculated the weight of those materials. Section 2K1.3(b) requires base offense level increases ranging from 1 level to 5 levels depending on the weight(in pounds) of explosive materials involved in the offense. In providing added points as is done in § 2K1.3(b) the number of pounds is used to delineate additional or greater culpability. Here, as indicated elsewhere, the probation officer calculated the number of pounds to be in excess of 1,000 pounds resulting in a five (5) level increase.

In determining the weight of explosive material, the court is guided by U.S.S.G. § 2K1.3, application note 5 which provides:

For purposes of calculating the weight of explosive materials under subsection (b)(1), include only the weight of the actual explosive material and the weight of packaging material that is necessary for the use or detonation of the explosives. Exclude the weight of any other shipping or packaging materials. For example, the paper and fuse on a stick of dynamite would be included; the box that the dynamite was shipped in would not be included.

Because, "[i]t is often difficult to establish weight with great precision[, w]hat is required... is [a] reasonable estimate under all the circumstances..." *Thier v. United States,* 31 F.Supp.2d 424, 432 (M.D.Pa.,1998).

The probation officer, based upon bills of lading admitted at trial which set out the various fireworks purchases made by the Defendant, subtracted the gross weight of the explosive materials (12,030 pounds) from the weight of the shipping and packaging materials (approximately 1.5 to 2 lbs. each) and reached the conclusion that approximately 11,000 pounds of explosive materials were involved in the offense.

At the sentencing hearing, the Government presented the testimony of Dennis Blasius ("Blasius"), an investigator with

the Consumer Product Safety Commission, at the sentencing hearing. Blasius examined the fireworks evidence and participated in the investigation of Shearer's case on behalf of the Government and thus, he testified that he had familiarity with the various explosive devices in the case. Blasius further testified that he had reviewed invoices of the 25 Shot Strobing Thunder devices purchased from Island Fireworks and Wolverine Fireworks and that the devices he weighed and examined were representative samples of the devices purchased from those stores. With respect to these devices, Blasius, having referenced the application note 5, testified that the entire device including its packaging was necessary to deflagrate the device. In particular, Blasius testified that:

> . . . there's no way to detonate the device without the fuse. There's no way to contain the flash powder without the tubes. There would be no way to have the 25 shots simultaneously or consecutively explode unless the entire packaging was present.

(Hrg.Transcript, p. 40). Blasius further testified that the only packaging that was unnecessary to detonate the devices was the shipping boxes, weighing around 2 pounds each, that contained the devices. Given the Government's evidence that 396 cases had been purchased by Shearer, Blasius concluded that the weight of the fireworks was in excess of 11,000 pounds, calculated by subtracting the weight of the shipping boxes (2 lbs. × 396 cases) from the gross weight of 12,030 pounds. *Id.* at 41.

On the basis of the above facts, it would be an inordinately difficult task for Shearer to argue for a reduction of illegal fireworks below 1,000 pounds. Nevertheless, in response to the above testimony, Shearer proffered a letter from Professor Rebecca D. Henry ("Dr. Henry"), a professor in the Science Department of Tri–State University, which indicates that a test was performed wherein ten of the twelve Strobing Thunder 25 shot cakes from one case were weighed before deflagration, fired, and then reweighed. According to Dr. Henry's calculations, after firing, 61.8% of the weight percent remained, or approximately 16 lbs.[10] (Dfdt.'s Exh. A). This, in turn, leads to a calculation that approximately 10 lbs. of material was consumed during the firing.[11]

Having reviewed the various calculations by Dr. Henry and the conclusions reached by Blasius, it is clear that this objection is much ado about nothing. To the extent Dr. Henry and Blasius disagree on the final calculation of the weight, it matters not a whit, for as long as the conclusion is in excess of 1,000 pounds, the probation officer properly assessed a 5 level enhancement. Here, from what the court can discern, Blasius' conclusion, in

---

**10.** Dr. Henry also determined that the weight of the cardboard packaging materials was 1 lb. 9.5 oz, which closely resembles the Probation Officer's conclusion that the cardboard packaging materials weighed approximately 2 lbs.

**11.** Defendant also asserts in a footnote that the only evidence that would support unlawful distribution is evidence that he sold five (5) cases of display fireworks to Pauline St. Marie and so no increase should apply because the weight would be less than 10 pounds. However, an accurate reading of the application note cited by Defendant is that the determination of the weight of explosive materials occurs by counting those "explosive materials" that "were unlawfully sought to be obtained, unlawfully possessed, **or** unlawfully distributed," Application Note 6, § 2K1.3, not merely those unlawfully distributed as Shearer argues. In this case, the evidence at trial is that a total of 396 cases of display fireworks came into Shearer's possession at various different times. Thus, it is entirely proper for the probation officer and the government to rely on these amounts.

which he expressly references the application notes to the sentencing guidelines, was that the explosive materials weighed in excess of 11,000 pounds counting all of the materials necessary to deflagrate the devices. Dr. Henry, while utilizing a different and perhaps questionable methodology [12] (at least for guideline purposes), concluded that 38.2% of explosive materials were consumed during firing which translates into about 4,150 pounds. Thus, Dr. Henry's conclusion is that 4,150 pounds of material were necessary to explode the device.

Dr. Henry's conclusion stems, it appears, from her theory that the "actual weight" of explosive materials, is determined by the difference in weight before and after firing a device. However, Shearer points to no legal basis to support this methodology for weight calculation and, from the court's point of view, it appears that this methodology does not account for the weight of the packaging material necessary to deflagrate the device which makes it contrary to the plain language of application note 5 which expressly provides that the weight includes "the actual explosive material **and** the weight of packaging material that is necessary for the use or detonation of the explosives." In fact, the application note provides an example which appears directly counter to the method utilized by Dr. Henry: "For

example, the paper and fuse on a stick of dynamite would be included..." *Application Note 5.*[13] Accordingly, the court does not find Dr. Henry's calculations reliable and, as noted, even utilizing those calculations, the Government has met its burden of demonstrating a reasonable estimate that the explosive materials here weighed in excess of 1,000 pounds. The probation officer properly assessed a five level increase and the Defendant's objection to the increase is DENIED.

### C. Defendant's Objections to the § 3B1.1 enhancement for Leader/Organizer

The probation officer assessed defendant a four level enhancement under U.S.S.G. § 3B1.1(b) for being an organizer or leader of at least five other persons involved in the criminal activity. Section 3B1.1(a) directs that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." The fourth application note of § 3B1.1, provides interpretive guidance of this provision:

In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making

---

**12.** Shearer did not call Dr. Henry as a witness nor did he set forth the methodology or rationale underlying her conclusions. Therefore, the court has no basis with which to ascertain whether her methodology was an appropriate one to calculate the weight of explosive materials.

**13.** Defendant also suggests that he is entitled to subtract 130 milligrams from the weight of the display fireworks because he could have lawfully possessed consumer fireworks which contain up to that amount. Phrased differently, Defendant argues that because the Guidelines state that the determination of the

weight of explosive materials occurs by, "count[ing] only those explosive materials that were ... unlawfully distributed," Application Note 6, § 2K1.3, the amount of explosive materials beyond the legal amount for consumer fireworks should be the only amounts attributed to him. This argument that he should receive "credit" for the weight of explosive materials that he would legally have been entitled to possess/distribute as consumer fireworks (130 mg), is not well-taken. The point is that Shearer illegally possessed display fireworks, not whether some of the materials inside it might, in isolation, have been within the scope of legal fireworks.

authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

§ 3B1.1, commentary n. 4. None of these factors is essential in determining whether the adjustment applies, nor must a court assign equal weight to each factor. See *United States v. Bush*, 79 F.3d 64, 67 (7th Cir.1996). Instead, the district court must evaluate the factors in light of the guidelines' intent to punish with greater severity those with greater responsibility for the crime, namely the leaders and organizers of the criminal activity. See *United States v. Sierra*, 188 F.3d 798, 804 (7th Cir.1999); *United States v. Mustread*, 42 F.3d 1097, 1104 n. 3 (7th Cir.1994) (ultimate question is what relative role defendant played).

■ In this case, the probation officer determined that Shearer utilized as many as nine (9) employees in the handling of the display fireworks. Shearer objects to this conclusion stating that there is no evidence to support a determination that five (5) or more of those employees were "participants" as defined in the Guidelines.

Application Note 1 to § 3B1.1 defines a participant as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1(a), Application Note 1. The guideline offers no further definition of "participant" or what it means to be "criminally responsible," but cases applying the guideline uniformly count as participants persons who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance. See, e.g., *United States v. Lewis*, 68 F.3d 987, 989 (6th Cir.1995) (vacating sentence based on fact that other individuals did not knowingly

participate in the offense and therefore could not be fairly considered "participants" under Section 3B1.1). In this case, defendant argues that the Government has not established that the employees were knowingly offering their assistance to a criminal objective or were aware of the criminal objective.

Before turning to this argument, however, it is critical to note that the § 3B1.1 enhancement applies in two discrete circumstances, only one of which requires the trial court to identify five or more participants. Even where the defendant led or organized fewer than five participants, the leader/organizer enhancement applies where the criminal activity was "otherwise extensive" and the defendant oversaw at least one participant. See U.S.S.G. § 3B1.1(a). Indeed, the district court may enhance a defendant's sentence without identifying five or more participants if the court finds by a preponderance of the evidence that the criminal activity was otherwise extensive and identifies at least one participant. Here, even if the defendant's contentions with respect to the number of participants is correct, the Government has, without doubt, establish "otherwise extensive" criminal activity so as to support the enhancement.

The Government established at trial, and the probation officer properly noted, that six employees, some knowingly, placed false consumer hazard class labels on display fireworks to hide Shearer's illegal activities. See Johnston Test. at 30–35, 59–62 (testifying that defendant directed him to relabel boxes and move display fireworks); Waxel Test. at 58–63 (stating that he relabeled boxes at defendant's request and was told "not to say anything" if asked); Ballenger Test. at 52–54(indicating that Shearer informed him to relabel display fireworks because they were "illegal"); Baughman Test. at 40–44 (indicating

that he was told to relabel boxes "so they could store them and not worry about getting raided or arrested."); (Baughman Test. at 44) (indicating that Williams told Baughman to relabel display fireworks boxes as 1.4G consumer fireworks because they could not store 1.3G). The trial record also established that Waxel, a minor, and Matthew Shearer, defendant's son and also a minor, placed false 1.4G consumer hazard class labels on 1.3G display fireworks.

In addition to these employees, Robert Bombka, Nelson Shearer, and Ed Stearns acted, in varying capacities, as straws to facilitate the illegal conduct. The trial record established that defendant utilized Bombka's license to facilitate purchases of display fireworks. Bombka testified at trial that:

— he knew that his permit was not transferable but agreed to purchase fireworks for Shearer in Michigan (Bombka Test. at 263);

— defendant asked/directed him to get him a load of fireworks in Michigan (Bombka Test. at 264) and he did so, delivering them to Shearer's business (Bombka Test. at 273).

— defendant asked/directed him to "sign a license or a permit" for his brother to go to Wisconsin and bring back fireworks and Bombka did so knowing that it was not proper (Bombka Test. at 265)

— he has never done business with Island Fireworks in Wisconsin and never went there to pick up fireworks; he never selected, transported, received, or possessed any fireworks from Island Fireworks in Wisconsin (Bombka Test. at 268).

— invoices showing purchases made by him were false as were documents indicating that Nelson Shearer was an employee of Bombka's (Bombka Test. at 269).

— he and Shearer exchanged checks at Shearer's request in the amount of $15,169 so that Shearer could pay Island Fireworks using a check drafted from Bombka's account rather than his own (Bombka Test. at 278).

— he sent Wolverine Fireworks in Michigan an "intended use" statement which was false.

Likewise, the trial testimony established that the defendant directed his brother, Nelson, to pose as an employee of Bombka's to pick up fireworks at Island Fireworks in Wisconsin despite Nelson's never having met, let alone been employed by, Bombka (N.Shearer Test. at 23—"I did it for my brother, a favor"). Finally, Ed Stearns was directed by Shearer to lease storage space for Shearer's fireworks and to pay the month rental fee directly and await reimbursement from Shearer.

To properly apply § 3B1.1, "a district court must make both a status determination-a finding that the defendant acted as a leader or organizer of the criminal activity-and a scope determination-a finding that the criminal activity met either the numerosity or the extensiveness benchmarks established by the guidelines." *United States v. Tejada–Beltran*, 50 F.3d 105, 110 (1st Cir.1995). Here, based on the trial testimony above, it is clear that the defendant organized and acted as a leader of the criminal enterprise. He recruited Bombka so that he could obtain fireworks using his permit, he directed the purchases by Bombka, arranged for their pick up by using either Bombka or his brother, organized the payments for the purchases, recruited Ed Stearns to rent a storage location for the illegal fireworks, and directed/recruited some of his employees to illegally relabel boxes.

Moreover, the court concludes that the criminal activity qualifies as "otherwise ex-

tensive" under the guidelines. Indeed, in making this determination "all persons involved during the course of the entire offense are to be considered," not just those knowingly aiding in the criminal conduct. *See* U.S.S.G. § 3B1.1, *Application Note 3* ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."). Here, given the logistics and planning that was involved with this arrangement and the sheer number of persons used to facilitate the scheme, it is clear that the criminal activity was "otherwise extensive" for purposes of the guidelines. Accordingly, the court concludes that the probation officer properly increased the defendant's base offense four levels.[14] Defendant's objection is DENIED.

### D. Defendant's Objection to the Enhancement under U.S.S.G. § 3B1.4 for Use of a Minor

Next, Shearer objects to the enhancement under U.S.S.G. § 3B1.4 for use of a minor in the criminal enterprise. On this point, Shearer does not object to the factual conclusion that minors were used. Rather, he asserts that enhancing his sentence under this guideline provision as well as the guideline provision for being a leader or organizer constitutes impermissible "double counting."

"[D]ouble counting occurs when identical conduct is described in two different ways so that two different adjustments apply." *United States v. Haines*, 32 F.3d 290, 293 (7th Cir.1994). However, double counting is permissible where more than

one type of harm is caused by the defendant's conduct. *See United States v. Reese*, 2 F.3d 870, 895 (9th Cir.1993). As the Ninth Circuit has noted in *United States v. Gonzalez* 262 F.3d 867, 871 (9th Cir.2001), an enhancement under § 3B1.1(c) (leader/organizer) and § 3B1.4 (use of a minor) does not result in double counting because::

> Involving others in criminal wrongdoing is harmful without reference to the age of the individuals. *See* U.S.S.G. § 3B1.1(c). Similarly, use of a minor is harmful whether or not the defendant's role in the offense is that of a leader or organizer. *See* U.S.S.G. § 3B1.4.

Here, while Shearer believes that the identical conduct utilized to give him an upward adjustment for his role in the offense is also being utilized to upwardly adjust his sentence for use of a minor, it is clear that the conduct giving rise to both enhancements gives rise to separate harms. As the Government points out, the two enhancements are intended to punish the harmful result from distinct conduct. The Government argues that the "one adjustment focuses on the minors, who were exploited when the defendant used them to aid and abet his criminal conduct; the other adjustment focuses on the defendant conduct . . ." The court agrees that the two harms here are distinct and thus support enhancements under both guideline provisions without impermissible double counting. Therefore, defendant's objection to the § 3B1.1 enhancement is overruled.

### E. Defendant's Objection to the Obstruction of Justice Enhancement

Defendant objects to the two (2) level enhancement for obstruction of justice

---

**14.** Defendant would further be hard-pressed to argue that Bombka would not be a "criminally responsible" person for his part in the scheme, particularly in light of counsel's closing argument at trial wherein he indicated over and over that Bombka was given a "pass" from prosecution by the government in return for his testimony against Shearer.

pursuant to U.S.S.G. § 3C1.1. Section 3C1.1 of the United States Sentencing Guidelines provides that "[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels." That increase was made in this case by the probation officer and the court concludes that it was not error to do so.

■■ Without question, defendant perjured himself during the trial of this cause. "Perjury is a prime example of conduct that warrants consideration of the imposition of an obstruction of justice enhancement." *United States v. Bass*, 325 F.3d 847, 850 (7th Cir.2003). It is defined as providing "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Jackson*, 300 F.3d 740, 749 (7th Cir.2002). "To properly support an enhancement for obstruction of justice, the district court must make independent findings as to all of the elements of perjury: falsity, willfulness, and materiality." *United States v. Carrera*, 259 F.3d 818, 830 (7th Cir.2001).[15]

■ In this case, Defendant testified falsely about that: (1) he did not purchase display fireworks from Island Fireworks (Shearer Test. at 214–215); (2) he did not sell display fireworks in 1999 (Shearer Test. at 229–230); (3) he believed Bombka had an ATF dealer's license rather than a permit (Shearer Test. at 215, 232); (4) he did not sell display fireworks to Pauline St. Marie; and (5) Bombka purchased display fireworks from Wolverine Fireworks (Shearer Test. at 230–232).

The evidence contrary to Shearer's position on each of the above points was well-established at trial and supported not only by in court testimony but also by the trial exhibits. Shearer perjured himself relating to virtually every factual issue material to his guilt and attempted to mislead the jury into believing that he had renewed his ATF license and was operating under a valid license when, in fact, his mode of operation was completely inconsistent with such a belief and he could offer, and the government could not produce, any documentation supporting the contention that a renewal application was ever actually filed. Shearer's *modus operandi*, particularly his use of straw persons to facilitate fireworks purchases and his tampering with fireworks labels to avoid detection, was established by all other witnesses in the case who, in the court's estimation, testified credibly. Moreover, in the instance of

---

**15.** "[T]he 'independent finding requirement' is not as exacting as one would assume.... While the Supreme Court has articulated that, when making a finding of perjury, it is preferable to have the district court address each element of the alleged perjury in a separate and clear finding, the district court's determination that the obstruction of justice enhancement is required is sufficient if 'the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury.' ... Hence, it is not necessary for the sentencing judge to conduct a mini-trial with respect to each of the defendant's false statements, nor must the judge set forth his or her findings specifically in terms of the elements of perjury.... As we have interpreted [the Supreme Court's opinion in] *[United States v.] Dunnigan*, [507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)] separate findings are not strictly necessary so long as the court determined that the defendant lied to the judge and jury about matters crucial to the question of the defendant's guilt." *United States v. White*, 240 F.3d 656, 662 (7th Cir.2001) (citations omitted).

sales to Pauline St. Marie, she testified credibly that Shearer sold her "the good stuff" on several occasions, that she wrote checks for the purchases to Shearer and that he had extended her credit on the purchases. Despite the documentary evidence to the contrary, Shearer denied these transactions.

Simply stated, Shearer willfully fabricated a story on the witness stand in an attempt to mislead the jury and the court as to the circumstances material to his guilt. For this reason, the probation officer did not err in assessing the obstruction of justice enhancement. The Defendant's objection is DENIED.

## F. Defendant's Objection to the Acceptance of Responsibility Determination

■ Finally, Shearer contends that the probation officer wrongly failed to include a reduction to his base offense level for acceptance of responsibility. In support of this contention, Shearer states only that "there is nothing in Defendant's actions or conduct to date that does, or should foreclose a reduction for acceptance of responsibility." In response, the Government argues that the record shows that Shearer exercised the right to trial and put the Government to its burden of proof at trial and that Shearer denied his own involvement with the criminal enterprise.

■ Exercising the right to trial does not absolutely preclude an acceptance of responsibility reduction, *United States v. Hernandez*, 330 F.3d 964, 985 (7th Cir. 2003), but, whether he proceeds to trial or not, the defendant bears the burden of showing that he is entitled to the reduction, U.S.S.G. § 3E1.1, comment. (n. 3);

*United States v. Booker*, 248 F.3d 683, 690 (7th Cir.2001). Only in rare cases will a defendant who goes to trial merit a reduction in offense level for acceptance of responsibility, *Hernandez*, 330 F.3d at 985, since the reduction is "not intended to apply to a defendant who puts the government to its burden of proof at trial" by contesting factual issues. U.S.S.G. § 3E1.1, comment. (n. 2).

■ Moreover, "a defendant who obstructs justice is presumed not to have accepted responsibility." *United States v. Fudge*, 325 F.3d 910 (7th Cir.2003) *citing*, U.S.S.G. § 3E1.1, Application Note 4; *United States v. Travis*, 294 F.3d 837, 840 (7th Cir.2002).[16] Where, as here, defendant "obstructed justice, he must demonstrate that his case is 'extraordinary'" so as to justify a downward adjustment for acceptance of responsibility." *Id.* citing, U.S.S.G. § 3E1.1, Application Note 4.

Defendant has wholly failed to meet his burden of proving that he is entitled to a reduction for acceptance of responsibility. He chose to go to trial to dispute his factual guilt and in the process of doing so repeatedly lied. Shearer challenged the sufficiency of the evidence against him to establish the charges in the indictment. At trial, Shearer's defense strategy was a denial of the basic facts in the indictment, namely that he did not unlawfully deal in display fireworks and that he did not intentionally tamper with labels or use others for that purpose. Such a challenge necessarily involves the resolution of factual issues, and so, obstruction of justice issues aside, it is not one of the rare exceptions to the general rule that a defendant who exercises his right to trial does

---

16. The Court notes that this is only a presumption and that the two are not mutually exclusive such that a defendant who obstructs justice may never get credit for acceptance of responsibility. *See, Travis,* 294 F.3d at 840 (collecting cases). Generally, this can occur in the unusual case where the defendant initially obstructs justice and then later accepts responsibility. *United States v. Mayberry,* 272 F.3d 945, 949 (7th Cir.2001).

not merit an acceptance-of-responsibility reduction." *See United States v. Curtis,* 37 F.3d 301, 309 (7th Cir.1994). As a result, the probation officer correctly determined that no reduction for acceptance of responsibility should be given and the Defendant's objection is DENIED.

### CONCLUSION

Based on the foregoing, Defendant's objections to the PSR are DENIED. Defendant's request for a downward departure is GRANTED. The probation officer is directed to revise the presentence investigation report in accordance with this opinion. A sentencing date will be set by way of separate minute entry.